## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **IN RE: IH 1, Inc.,** *et al.*, | : | **CASE NO. 09-10982-PJW** |
| | : | |
| **Debtors** | : | |
| | : | |
| **GEORGE L. MILLER,** | : | |
| **Chapter 7 Trustee,** | : | **ADVERSARY NO.** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SUN CAPITAL PARTNERS, INC.** | : | |
| **5200 Town Center Circle, Suite 600** | : | |
| **Boca Raton, FL 33486** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **SUN INDALEX, LLC** | : | |
| **5200 Town Center Circle, Suite 600** | : | |
| **Boca Raton, FL 33486** | : | |
| | : | |
| **SUN INDALEX FINANCE LLC** | : | |
| **5200 Town Center Circle, Suite 600** | : | |
| **Boca Raton, FL 33486** | : | |
| | : | |
| **SUN CAPITAL PARTNERS III, QP, LP** | : | |
| **5200 Town Center Circle, Suite 470** | : | |
| **Boca Raton, FL 33486** | : | |
| | : | |
| **SUN CAPITAL PARTNERS IV, LP** | : | |
| **5200 Town Center Circle, Suite 470** | : | |
| **Boca Raton, FL 33486** | : | |
| | : | |
| **SUN CAPITAL PARTNERS** | : | |
| **MANAGEMENT III, LP** | : | |
| **5200 Town Center Circle, Suite 470** | : | |
| **Boca Raton, FL 33486** | : | |
| | : | |
| **RODGER R. KROUSE** | : | |
| **5200 Town Center Circle, Suite 600** | : | |
| **Boca Raton, FL 33486** | : | |
| | : | |

**MARC J. LEDER**                              :
**5200 Town Center Circle, Suite 600**         :
**Boca Raton, FL 33486**                       :
                                               :
**TIMOTHY R.J. STUBBS**                        :
**1018 Sheridan Road**                         :
**Evanston, IL 60202**                         :
                                               :
**MICHAEL ALGER**                              :
**c/o Sun Capital Partners**                   :
**5200 Town Center Circle, Suite 600**         :
**Boca Raton, FL 33486**                       :
                                               :
**CLARENCE E. "Bud" TERRY**                    :
**c/o Sun Capital Partners**                   :
**5200 Town Center Circle, Suite 600**         :
**Boca Raton, FL 33486**                       :
                                               :
**M. STEVEN LIFF**                             :
**c/o Sun Capital Partners**                   :
**5200 Town Center Circle, Suite 600**         :
**Boca Raton, FL 33486**                       :
                                               :
**F. DIXON MCELWEE, JR**                       :
**2844 Banyan Boulevard Circle**               :
**Boca Raton, FL 33431**                       :
                                               :
**DAVID KREILEIN**                             :
**12468 Clearfalls Drive**                     :
**Boca Raton, FL 33428-4848**                  :
                                               :
**PATRICK LAWLOR**                             :
**5543 N Austin Avenue**                       :
**Chicago, IL 60630-1102**                     :
                                               :
**LYNN R. SKILLEN**                            :
**16331 SW 23rd Street**                  :
**Miramar, FL 33027-4406**                     :
                                               :
**MICHAEL GILLEN**                             :
**2150 S Ocean Boulevard Unit 2-F**            :
**Delray Beach FL 33483-6445**                 :
                                               :

2

870160_4

**DAVID FINNIGAN**                                   :
**820 Aurelia Street**                               :
**Boca Raton, FL 33486-3532**                        :
                                                     :
**INDALEX CO-INVESTMENT, LLC**                       :
**c/o Corporation Service Company**                  :
**2711 Centerville Road, Suite 400**                 :
**Wilmington, DE 19808**                             :
                                                     :
**HIG SUN PARTNERS, INC.**                           :
**c/o Valerie Serrano**                              :
**1001 Brickell Bay Drive, 27th Floor**              :
**Miami, FL 33131**                                  :
                                                     :
**GARY TALARICO**                                    :
**40-50 East 10th Street, Apt. 7H**                  :
**New York, NY 10003**                               :
                                                     :
**RONALD NELSON**                                    :
**3750 Villa Rosa Drive**                            :
**Canfield, OH 44406**                               :
                                                     :
        **Defendants.**                      :

## COMPLAINT

George L. Miller, in his capacity as the duly appointed Chapter 7 Trustee of IH 1, Inc., IH 2, Inc., IH 3, Inc., IH 4, Inc., and IH 5, Inc., by and through his undersigned counsel, brings this Complaint and alleges as follows:

## INTRODUCTION

1.      In 2005 Indalex Inc., among others, was acquired by Honeywell International Inc. ("Honeywell").

2.      Under Honeywell's management and control Indalex Inc., and its brother company, Indalex Limited, maintained an asset to debt ratio of greater than 3 to 1 and the operations of Indalex Inc. and Indalex Limited were highly profitable.

3

870160_4

3.      On February 2, 2006, Indalex Holding Corp., a wholly-owned subsidiary of Indalex Holdings Finance, Inc. acquired all of the outstanding stock of Indalex Inc. and Indalex Limited from Honeywell in a highly leveraged buy-out (the "Acquisition" or "LBO").

4.      As a result of the Acquisition, the consolidated operations of Indalex Inc. and Indalex Limited suddenly had an asset to debt ratio of slightly over 1 to 1 and the operations of Indalex Inc. and Indalex Limited became instantly financially precarious.

5.      The Acquisition was followed by a series of exorbitant distributions and payments to Sun Capital Partners, Inc. and/or its related entities.  These payments, which were not for reasonably equivalent value, caused Indalex Holdings Finance, Inc. and its subsidiaries including, but not limited to, Indalex Holding Corp. and Indalex Inc. to be insolvent, insufficiently capitalized and/or unable to meet their debts when due.

6.      As a result, on March 20, 2009 (the "Petition Date"), Indalex Holdings Finance, Inc., Indalex Holding Corp. and Indalex Inc., among others, (collectively referred to as "Debtors") filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. (the "Court") [1]

---

[1] On July 20, 2009, this Court entered an Order approving the sale of substantially all of the assets of the Debtors to Sapa Holdings AB and its affiliates ("SAPA").  As part of the sale to SAPA, Debtors were to undertake to change their then existing names.  On or about September 1, 2009, the following name changes became effective:

> Indalex Holdings Finance, Inc. changed its name to IH 1, Inc.;
> Indalex Holding Corp. changed its name to IH 2, Inc.; and
> Indalex Inc. changed its name to IH 3, Inc.;
> Caradon Lebanon, Inc. changed its name to IH 4, Inc.; and
> Dolton Aluminum Company, Inc changed its name to IH 5, Inc..

By Order dated September 28, 2009 this Court granted the request to change the caption of Debtors' cases to reflect the name changes.

4

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157(b) and (c) and 1334.

8.     This matter is a core proceeding under 28 U.S.C. §157(b)(2).

9.     Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409.

**THE PARTIES**

**The Plaintiff**

10.     By Motion dated September 21, 2009, the Official Committee of Unsecured Creditors sought an Order converting the IH 1- IH 5 Chapter 11 cases to cases under Chapter 7.

11.     Following a hearing, on October 15, 2009 the Court entered an Order converting the Chapter 11 cases to cases under Chapter 7.

12.     By Notice dated October 30, 2009, George L. Miller ("Miller") was advised that he had been appointed as Interim Trustee/Trustee for IH 1, IH 2, IH 3, IH 4 and IH 5 (1H 1, 1H 2, IH 3, IH 4 and 1H 5 will, from time to time, be collectively called "Indalex").

13.     The Plaintiff is the Chapter 7 Trustee of Indalex.

**The Defendants**

**Sun Capital Partners, Inc.**

14.     On information and belief, Sun Capital Partners, Inc. ("Sun") is a Florida corporation with a principal place of business at 5200 Town Center Circle, Suite 600, Boca Raton, FL.

15.     At all times relevant hereto, Sun was a private investment firm focused on leveraged buyouts, equity, debt and other investments.

5

16.     Sun operates a number of individual investment funds.

17.     On information and belief, on and after February 2, 2006, Sun, through various affiliates, owned 90.4% of the Debtors' common stock and 100% of their voting stock and, as a result, Sun controlled the Debtors' business affairs and policies.

18.     At all relevant times hereto, Sun was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**<u>Sun Indalex, LLC</u>**

19.     Sun Indalex, LLC ("Sun Indalex") is a Delaware limited liability company with a principal place of business at 5200 Town Center Circle, Suite 600, Boca Raton, FL.

20.     Sun Indalex is an affiliate of defendant Sun.

21.     50% of Sun Indalex is owned by Sun Capital Partners III, LP and defendant Sun Capital Partners III, QP, LP and the other half is owned by defendant Sun Capital Partners IV, LP.

22.     On February 2, 2006, Sun Indalex acquired 983,929 shares of Voting Common Stock in Indalex Holdings Finance, Inc. (which represents all the Voting stock in Indalex Holdings Finance, Inc.) in exchange for a promissory note in the principal amount of $1.45 million and $109,462,083 in immediately available funds.

23.     On information and belief, Sun Indalex is the managing member of defendant Sun Indalex Finance LLC.

24.     At all relevant times hereto, Sun Indalex was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

6

**Sun Indalex Finance LLC**

25.     Sun Indalex Finance LLC ("Sun Indalex Finance") is an affiliate of defendant Sun.

26.     On information and belief, Sun Indalex is Sun Indalex Finance's managing member.

**Sun Capital Partners III QP, LP**

27.     Sun Capital Partners III, QP, LP ("Sun Capital III") is a Delaware limited partnership with a principal place of business at 5200 Town Center Circle, Suite 470, Boca Raton, FL.

28.     Sun Capital III is an affiliate of defendant Sun.

29.     As set forth above, Sun Capital III also has an ownership interest in Sun Indalex.

30.     On June 1, 2007, Sun Capital III received, by wire transfer, a dividend from Indalex of $34,636,971.43.

**Sun Capital Partners IV, LP**

31.     Sun Capital Partners IV, LP ("Sun Capital IV") is a Delaware limited partnership with a principal place of business at 5200 Town Center Circle, Suite 470, Boca Raton, FL.

32.     Sun Capital IV is an affiliate of defendant Sun.

33.     As set forth above, Sun Capital IV also has an ownership interest in Sun Indalex.

34.     On June 1, 2007, Sun Capital IV received, by wire transfer, a dividend from Indalex of $34,636,971.42.

**Sun Capital Partners Management III, LP**

35.     Sun Capital Partners Management III, LP ("Sun Management") is a Delaware limited partnership with a principal place of business at 5200 Town Center Circle, Suite 470, Boca Raton, FL.

36.     Sun Management is an affiliate of defendant Sun.

37.     Sun Management is party to a Management Services Agreement with Indalex Holding Corp. and Indalex Limited dated as of February 2, 2006.

38.     Between February 2, 2006 and the Petition Date Sun Management was paid over $10 million in purported management fees, transaction fees and expense reimbursements.

**Rodger Krouse**

39.     At all relevant times, Rodger Krouse ("Krouse") was the co-founder and co-CEO of defendant Sun.

40.     On information and belief, Krouse is a beneficial owner of Sun Indalex LLC, and a 50% owner of the membership interests in Sun Capital Partners III, LLC and Sun Capital Partners IV, LLC.

41.     Sun Capital Partners III, LLC is the general partner of Sun Capital Advisors III, LP which is the general partner of Sun Capital III.

42.     Sun Capital Partners IV, LLC is the general partner of Sun Capital Advisors IV, LP which is the general partner of Sun Capital IV.

43.     From February 2, 2006 to June 30, 2006 Krouse also served on the Board of Directors of Indalex Holdings Finance, Inc. and as one of its officers.

8

870160_4

**Marc Leder**

44.     At all relevant times, Marc Leder ("Leder") was the co-founder and co-CEO of Sun.

45.     On information and belief, Leder is also a beneficial owner of Sun Indalex LLC, and a 50% owner of the membership interests in Sun Capital Partners III, LLC and Sun Capital Partners IV, LLC.

46.     From February 2, 2006 to June 30, 2006 Leder also served on the Board of Directors of Indalex Holdings Finance, Inc. and as one of its officers.

**Timothy R.J. Stubbs**

47.     At all relevant times hereto, Timothy R.J. Stubbs ("Stubbs") was the President and Chief Executive Officer of Indalex Holdings Finance, Inc. and an officer of the other debtors.

48.     At all relevant times hereto, Stubbs was also a member of Debtors' Boards of Directors.

49.     On the date the Debtors filed for bankruptcy protection, Stubbs was also a .09% shareholder of Indalex Holdings Finance, Inc.

50.     Stubbs signed a Consent in Lieu of a Special Meeting of the Board of Directors of Indalex Holdings Finance, Inc. dated May 31, 2007 which Consent authorized Indalex Holdings Finance, Inc. to declare and pay a dividend to its shareholders of $76.71 per share.

51.     On June 1, 2007, Stubbs received, by wire transfer, a dividend from Indalex of $68,809.52.

9

870160_4

52.     At all relevant times hereto, Stubbs was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**Michael Alger**

53.     From February 2, 2006 to August 24, 2007 Michael Alger ("Alger") was Executive Vice President and Chief Financial Officer of Indalex Holdings Finance, Inc. and Indalex Holding Corp.

54.     Alger left Indalex in August 2007 to join Sun.

55.     At all relevant times, including after his departure from the employ of Indalex Holding Corp., Alger was also a member of Debtors' Boards of Directors.

56.     Following his employment by Sun, Alger was Assistant Secretary and a Vice President of Indalex Holdings Finance, Inc.

57.     On the date the Debtors filed for bankruptcy protection, Alger was also a .067% shareholder of Indalex Holdings Finance, Inc.

58.     Alger signed a Consent in Lieu of a Special Meeting of the Board of Directors of Indalex Holdings Finance, Inc. dated May 31, 2007 which Consent authorized Indalex Holdings Finance, Inc. to declare and pay a dividend to its shareholders of $76.71 per share.

59.     On June 1, 2007, Alger received, by wire transfer, a dividend from Indalex of $51,645.45.

60.     At all relevant times hereto, Alger was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**Clarence E. "Bud" Terry**

61.     Since 1999, Clarence E. "Bud" Terry ("Terry") has been employed in some capacity by Sun or one or more of its affiliates.

62.     At all relevant times hereto, Terry was one of Sun's designated representatives on Debtors' Boards of Directors.

63.     Terry signed a Consent in Lieu of a Special Meeting of the Board of Directors of Indalex Holdings Finance, Inc. dated May 31, 2007 which Consent authorized Indalex Holdings Finance, Inc. to declare and pay a dividend to its shareholders of $76.71 per share.

64.     On June 1, 2007, two affiliates of his employer, Sun Capital III and Sun Capital IV, received, by wire transfer, dividends of $34,636,971.43 and $34,636,971.42, respectively.

65.     At all relevant times hereto, Terry was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**M. Steven Liff**

66.     Since 2000, M. Steven Liff ("Liff") has been employed in some capacity by Sun or one or more of its affiliates.

67.     At all relevant times hereto, Liff was one of Sun's designated representatives on Debtors' Boards of Directors.

68.     Liff signed a Consent in Lieu of a Special Meeting of the Board of Directors of Indalex Holdings Finance, Inc. dated May 31, 2007 which Consent authorized Indalex Holdings Finance, Inc. to declare and pay a dividend to its shareholders of $76.71 per share.

69.     On June 1, 2007, two affiliates of his employer, Sun Capital III and Sun Capital IV, received, by wire transfer, dividends of $34,636,971.43 and $34,636,971.42, respectively.

870160_4

70.    At all relevant times hereto, Liff was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**F. Dixon McElwee, Jr.**

71.    From June 30, 2006 through October 31, 2007, F. Dixon McElwee, Jr. ("McElwee"), who was then an employee of Sun or one of its affiliates, served as one of Sun's designated representatives on Debtors' Boards of Directors.

72.    During the above referenced time period, McElwee also served as Vice President and Assistant Secretary of the Debtors' Boards of Directors.

73.    From July 10, 2007 through October 31, 2007 McElwee also served on the Indalex Holdings Finance, Inc. Board of Directors' Audit Committee.

74.    McElwee signed a Consent in Lieu of a Special Meeting of the Board of Directors of Indalex Holdings Finance, Inc. dated May 31, 2007 which Consent authorized Indalex Holdings Finance, Inc. to declare and pay a dividend to its shareholders of $76.71 per share.

75.    On June 1, 2007, two affiliates of his employer, Sun Capital III and Sun Capital IV, received, by wire transfer, dividends of $34,636,971.43 and $34,636,971.42, respectively.

76.    From June 2006 through October 2007, McElwee was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**Patrick Lawlor**

77.    From August 24, 2007 through the Petition Date, Patrick Lawlor ("Lawlor") was Chief Financial Officer of Indalex Holdings Finance, Inc. and a member of the Debtors' Boards of Directors.

78.    From and after August 24, 2007, Lawlor was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**David Kreilein**

79.    From February 2, 2006 to June 2, 2006, David Kreilein ("Kreilein") was a member of the Board of Directors of Indalex Holdings Finance, Inc.

80.    During this same time period, Kreilein was a Vice President and portfolio manager for Sun.

81.    Between February 2, 2006 and June 2, 2006, Kreilein was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**Lynn R. Skillen**

82.    On information and belief, from July 10, 2007 to the Petition Date, Lynn R. Skillen ("Skillen") was a member of the Board of Directors of Indalex Holdings Finance, Inc.

83.    During this time period Skillen also served on the Indalex Holdings Finance, Inc. Board of Directors' Audit Committee.

84.    At all relevant times hereto, Skillen was also employed by Sun as a Senior Vice President and/or Managing Director.

85.    On and after July 10, 2007, Skillen was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**Michael Gillen**

86.    From February 2, 2006 to June 30, 2006, Michael Gillen ("Gillen") was a member of the Board of Directors of Indalex Holdings Finance, Inc.  During this time, Gillen was also employed by Sun.

13

87.     From February 2006 to June 30, 2006, Gillen was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**David F. Finnigan**

88.     On information and belief, from June 12, 2008 to the Petition Date, David F. Finnigan ("Finnigan") was a member of the Board of Directors of Indalex Holding Corp.

89.     During this same time period, Finnigan was also a Vice President of Indalex Holding Corp.

90.     At all relevant times hereto, Finnigan was also employed by Sun as a Managing Director.

91.     From June 12, 2008 to the Petition Date, Finnigan was an insider and person in control of Debtors as those terms are defined in 11 U.S.C. §101(31).

**Indalex Co-Investment, LLC**

92.     On information and belief, Indalex Co-Investment, LLC is a Delaware Corporation.

93.     At all relevant times Indalex Co-Investment, LLC. was a shareholder of Indalex Holdings Finance, Inc.

94.     On June 1, 2007, Indalex Co-Investment, LLC received, by wire transfer, a dividend of $6,894,437.74.

**HIG Sun Partners, Inc.**

95.     On information and belief, HIG Sun Partners, Inc. is a Florida Corporation.

96.     At all relevant times HIG Sun Partners, Inc. was a shareholder of Indalex Holdings Finance, Inc.

14

97.     On June 1, 2007, HIG Sun Partners, Inc. received, by wire transfer, a dividend of $62,679.49.

**Gary Talarico**

98.     At all times relevant hereto, Gary Talarico ("Talarico") was Managing Director of Sun Capital Partners where he had responsibility for its New York and Japan operations.  At all relevant time, Talarico was a shareholder of Indalex Holdings Finance, Inc.

99.     On June 1, 2007, Talarico directly received, or Linda Filardi received on his behalf, by wire transfer, a dividend of $114,631.44.

**Ronald Nelson**

100.    At all times relevant hereto, Ronald Nelson ("Nelson") was Plant Manager of Indalex Inc.

101.    On June 1, 2007, Nelson received, by wire transfer, a dividend of $30,956.62.

## BACKGROUND

102.    Debtors were producers of soft alloy aluminum extrusion products in the United States and Canada.

103.    At all times relevant hereto, Debtors' two largest markets were transportation (non-auto) and residential building and construction.  These markets, combined, represented approximately 60% of Indalex's annual shipment volume.

104.    As set forth above, on February 2, 2006, Indalex Inc.[2] and Indalex Limited were purchased by Indalex Holding Corp. in the LBO for approximately $425 million in cash, plus $23 million in transaction costs.

---

[2] Dolton Aluminum Company and Caradon Lebanon, Inc. were wholly-owned subsidiaries of Indalex Inc.

105.    Indalex Holding Corp. is a wholly-owned direct subsidiary of Indalex Holdings Finance, Inc. which entity is owned by affiliates of Sun.

106.    As a result of the LBO, on and after February 2, 2006, Indalex was controlled by Sun.

107.    On February 2, 2006, the Board of Indalex Holdings Finance, Inc. was comprised of Stubbs, Alger and 6 Sun employees, including its co-founders and co-CEOs, Leder and Krouse.

108.    As one of its first acts, the Sun-controlled Board of Indalex Holdings Finance, Inc. elected each of its members to be an officer of Indalex Holdings Finance, Inc.; at the same time the Board elected 31 other Sun employees to be Vice Presidents of Indalex Holdings Finance, Inc.

109.    Thereafter, from time to time, a few members of the Board of Indalex Holdings Finance, Inc. changed but at all times from February 2, 2006 to the Petition Date Sun controlled the Boards of the Debtors as well as their business activities and policies.

110.    On information and belief, on February 2, 2006, the Board of Directors of Indalex Holding Corp, was also comprised of Stubbs, Alger and 3 Sun employees.   The same 5 individuals were also the members of the Indalex Inc. Board of Directors.

111.    The LBO was financed by an equity contribution from Sun, or its affiliates, of $111.25 million ($1.45 million of which was in a promissory note), borrowings on a revolving bank loan of $56.8 million (the "revolver") and Senior Second-Priority Notes totaling $280 million (the "Notes").

112.    The revolver, which was governed by a Credit Agreement dated as of February 2, 2006 (as amended) between Indalex Holdings Finance, Inc., Indalex Holding Corp., 6461948 Canada, Inc.[3] and JP Morgan Chase Bank, N.A. (as administrative agent) limited the total amount Indalex could borrow on the revolver.  The Credit Agreement also contained restrictions and financial covenants related to the financial performance of the US and Canadian operations which further affected how much each could borrow.  The revolver bore interest to be paid monthly.

113.    The Notes were governed by an Indenture which also contained restrictions with respect to Indalex's business operations as well as provisions addressing the then anticipated sale of Indalex Limited's interest in Asia Aluminum Group ("AAG").

114.    Specifically, the Indenture provided that should the AAG interest be sold, the first $50 million of any proceeds would be used to fund a redemption of the Notes.  The Indenture provided, further, that should the sale of AAG result in more than $50 million being paid, at least 25% of the amount above $50 million would be used to fund the redemption.

115.    The Indenture provided that the amount remaining after the mandatory offer to redeem the Notes occurred could be used to make Restricted Payments, including dividend payments, under certain enumerated circumstances.

116.    Absent a redemption pursuant to the Indenture, the Notes had a maturity date of February 14, 2014 and they bore interest at an annual rate of 11 ½% to be paid semi-annually in February and August commencing on February 1, 2007.

---

[3] This entity was a predecessor to Indalex Limited.

17

117.    As of February 2, 2006, Indalex Holding Corp., Indalex Limited and Sun's affiliate, Sun Management, also entered a Management Services Agreement ("MSA").[4]

118.    According to the terms of the MSA, Sun Management was to provide management and consulting services regarding the business of Indalex Holding Corp. and its affiliates and any other services "as may from time to time be reasonably requested by the executive officers of the Company and agreed to by the Manager."

119.    Irrespective of the services provided, the MSA guaranteed Sun Management an annual management fee, payable in quarterly installments, equal to the greater of $1 million or 2% of EBITDA.  The MSA listed Sun Management's first payment under this scheme as $250,000 which amount allegedly represented Sun Management's "pro rata portion of the Management Fee for the quarter ending March 31, 2006."

120.    The MSA also required Indalex Holding Corp. to reimburse Sun Management for all reasonable out-of-pocket fees and expenses incurred in the performance of its services.

121.    The MSA provided, further, that Sun Management would receive an additional fee equal to 1% of the aggregate consideration paid to or by Indalex Holding Corp. or any of its direct or indirect subsidiaries or shareholders, in connection with various corporate transactions including any refinancings, restructurings, equity or debt offerings, acquisitions, mergers, consolidations, business combinations, sales or divestitures.

122.    As a result of the latter arrangement, on information and belief Sun, through Sun Management and/or another Sun affiliate named Sun Capital Securities Offshore Fund Ltd.,

---

[4] Although dated as of February 2, 2006, on information and belief the MSA was not publicly filed until October 2006.

18

received payments totaling $5.5 million for its own affiliate to acquire Indalex and a different affiliate to purchase $15 million of the Notes.

123.   The MSA had a term of 10 years and had no provision by which it could be terminated prior to the end of that 10 year period.

124.   The MSA, which was so financially favorable to Sun, was executed, on Indalex Holding Corp.'s behalf, by Liff in his capacity as a Vice President of Indalex Holding Corp.

125.   At the time he was Vice President of Indalex Holding Corp. Liff was also a Managing Director of Sun.

126.   The MSA benefited Sun and its affiliates to the detriment of Indalex, its other shareholders and its creditors.

127.   Indeed, without fail, Sun Management received "management fees" from Indalex even though, on information and belief, Sun Management did not provide services of reasonably equivalent value.

128.   The "management fee" payments made to Sun Management from 2006 to the Petition Date included the following:

| Q1 2006 | $631,005 | Q3 2007 | $250,000 |
| Q2 2006 | $297,400 | Q4 2007 | $252,000 |
| Q3 2006 | $457,120 | Q1 2008 | $250,000 |
| Q4 2006 | $250,000 | Q2 2008 | $249,000 |
| Q1 2007 | $319,000 | Q3 2008 | $250,000 |
| Q2 2007 | $250,000 | Q4 2008 | $250,000 |
|  |  | Q1 2009 | $250,000 |

129.    These payments were made even though Indalex had a full complement of managers and professional staff, many of whom had been with Indalex for many years before the LBO and/or otherwise been in the extrusion industry including the President and CEO Stubbs and the CFO Alger.  In fact, as of February 2, 2006, Indalex had over 100 employees who were assigned the Lead Team, Plant Management, Finance, Human Resource and Administration responsibilities for Indalex and a complement of more than 200 other staff members who performed the Customer Service, IT, Procurement, Engineering and Health & Safety functions for Indalex.

130.    Shortly after the LBO, on or about April 14, 2006 Sun Indalex received its first payment of $364,000 in partial satisfaction of the promissory note issued in conjunction with the LBO.

131.    That same day, Sun Indalex exchanged the balance due on the promissory note for 9,875 voting shares in Indalex.

132.    The next month, on May 8, 2006, Sun Indalex sold 89,654 of its non-voting shares of Indalex common stock for $9,974,026.13.

133.    Thus, three short months after the LBO, Sun had already received in cash or stock, almost $17 million dollars.

134.    On June 26, 2006, Honeywell paid Indalex Holding Corp. $6.1 million which payment represented a post-closing working capital adjustment to the purchase price; the settlement was comprised of $5.9 million in principal and $200,000 in interest.

135.    Three weeks later, on July 18, 2006, Indalex Holdings Finance, Inc.'s Board signed a unanimous consent authorizing the payment of a dividend to shareholders of $1.521 per

20

share.  On information and belief, Sun, or one of its affiliates, received more than $1.37 million of this dividend.

136.    As a result of all of these payments, by the end of 2006, Sun had been paid almost $20 million; during this same time period, Indalex's total liabilities for the year just ended had ballooned to $508,285,000 from $195,286,000 at the end of 2005.

137.    Sun received these payments, including handsome "management fees," despite the fact that Indalex sustained an overall net loss in the period between February 2, 2006 and December 31, 2006 of almost $24 million and even though Indalex had negative income from operations between February and December 2006.

138.    All of these payments were also made despite the fact that the market for new residential construction and remodeling activity had, by Indalex's own admission, "slowed considerably during the second half of 2006."

139.    In fact, on November 20, 2006, Goldman Sachs issued a report based on Indalex's earnings call for the quarter ending September 30, 2006. This report confirmed that the market for Indalex's products was softening.  As part of its report, Goldman Sachs concluded that the deterioration in Indalex's sales would continue through mid-2007.  Goldman Sachs based its conclusions, in part, on the fact that in October 2006 new orders for extruded aluminum products in the United States were down 11.4% year over year.  Goldman Sachs's conclusions were also based on Indalex's public acknowledgment that its backlog of orders was down and that it was now expecting weakness in the trailer manufacturing sector as well.

**The Harbinger of Things to Come: Results for the Year Ending December 31, 2006**

140.   Consistent with the economic realities Indalex and the analysts were aware of, for the last quarter of 2006, Indalex sustained a loss from operations of $10.7 million.   In the comparable period in 2005, Indalex reported net income from operations of $7.5 million.

141.   In the last quarter of 2006, Indalex's adjusted EBITDA also decreased 41% when compared to the three months ending December 31, 2005.

142.   This weakening financial performance was explained, in part, by the fact that Indalex's shipments to the residential housing market -- a market making up almost 30% of its business in 2006 -- "were down 26% in the fourth quarter of 2006 as compared to the fourth quarter of 2005."

143.   In light of these results, in a press release preceding the submission of Indalex's 10K for the year ending December 31, 2006, Stubbs cautioned that both the fourth quarter of 2006 and the first quarter of 2007 had been and were going to be "challenging" to Indalex.   In the face of these challenges, Stubbs committed that Indalex would focus its efforts going forward on cash generation and improving cash flow from operations.

144.   In the 10K filed on April 4, 2007 (for the year ending December 31, 2006) ("the 2006 10K"), Indalex amplified the challenges Indalex then faced by conceding that housing starts for the first two months of 2007 were down 32% when compared to the first two months of 2006.   As a result of its economic data, Indalex admitted that it was uncertain "when the current downturn in this market will end."

145.   This economic tailspin was, or should have been, particularly worrisome to Indalex since, in its experience, "[d]eclines in shipment volume can have a disproportionate

22

impact on [its] results of operations due to the fixed operating cost requirements inherent in [its] operations."

146.    After issuing the above-referenced cautions regarding its dour economic situation, Indalex included a representation in the 2006 10K that it did not "anticipate paying any cash dividends in the foreseeable future" and it committed that any future decision to declare dividends would be made "at the discretion of [its] board of directors and [would] be dependent upon the existing conditions, including [Indalex's] financial condition, results of operations, contractual restrictions, capital requirements, business prospects, and other factors our board of directors deem relevant."  Seemingly as a reaffirmation and reassurance of its intention to forego dividends, Indalex added that its "current financing arrangements effectively prohibit us from paying cash dividends for the foreseeable future."

147.    On information and belief, Sun, as a sophisticated investor, appreciated the significance of all the economic results and indicators and their negative effect on Sun's ability to continue liquidating its equity position.  As a result, Sun seemingly decided to use its control over Indalex to accelerate its return on equity to the detriment of Indalex and its creditors.

148.    Specifically, despite the representation in its public SEC filings, less than six weeks later, on May 14, 2007, the Sun-controlled Indalex Holdings Finance, Inc.'s Board retained FTI Capital Advisors, LLC to analyze whether Indalex would be rendered insolvent if it paid a dividend to its shareholders -- primarily Sun -- of at least $76.6 million of the proceeds from the then-anticipated sale of Indalex Limited's interest in AAG.  FTI was paid $200,000 for this engagement.

149.    Notably, FTI was retained by the Board to analyze whether Sun could pull still more money out of Indalex even before the sale of Indalex's 25.1% interest in AAG had closed.

**Weak Demand and Disappointing Results for the First Quarter of 2007**

150.    The retention of FTI to "paper" this astonishing plan preceded, by just two days, Indalex's press release announcing its first quarter results for 2007.  This press release included Stubbs' admission that his prior concerns about the challenges Indalex faced had been realized and that "The first quarter of 2007 was a disappointing one overall for Indalex" with "those of our plants … focused on residential building and construction suffer[ing] significantly, with volume declines in excess of 20%."

151.    In addition to the above declines, Stubbs acknowledged that "operating performance at our Modesto and Watsonville, California plants was poor due to the previously announced consolidation of those plants."

152.    Indeed, for the quarter ending April 1, 2007, Indalex's net sales were off $20 million when compared to the three months ended April 2, 2006 and its extrusion shipment volume was off 14.6% in the first quarter of 2007 "as a result of weak market demand, particularly in the Residential Building and Construction end-user market."

153.    By sector, in the first quarter of 2007, Indalex experienced a 25% decrease in shipments to residential building and construction customers and a 15% decline to its transportation customers.

154.    As a result of its declines in the first quarter of 2007, Indalex sustained a loss from operations of $2.1 million as compared to income from operations of $400,000 for the same time period in 2005; Indalex's overall net loss for the first quarter of 2007 of $6.7 million.

24

155.    As set forth in Indalex's press release, in the first quarter of 2007 its Adjusted EBIDTA also dropped by 62%.

156.    In addition, far from meeting the goal of improving cash flow from operations, according to its press release, Indalex used $42.4 million of cash in operations as compared to $10 million needed for the same period in 2006.  The more than 400% increase in cash needed to sustain operations was attributable to, among other things, the first interest payment of $15.5 million due to the Noteholders on the enormous debt Indalex had been saddled with through the LBO.

157.    As a result of all of these factors, at April 1, 2007, Indalex's revolver borrowings had increased a whopping 77% since December 31, 2006; the revolver borrowings on April 1, 2007 were $20 million higher than Indalex had budgeted through March 2007.

158.    On May 18, 2007, Indalex's management had a conference call with financial analysts to discuss the financial results for the quarter ending April 1, 2007.

159.    In that call, Indalex revealed that its negative sector trends had continued into the second quarter of 2007, with Indalex's construction volumes then 11% lower than the second quarter of 2006 and its transportation customer shipments then down by 8% year to year.

160.    In its call with financial analysts, Indalex also revealed that it was beginning to encounter "price pressure" because of the dropping demand for its products.

161.    On information and belief, during the analysts' call, Indalex's management mentioned the sale of AAG and represented that it was management's intention to use at least $35 million of the proceeds from that sale to repay revolver borrowings.

162.    Commenting on this call in a research report issued on May 21, 2007, Goldman Sachs characterized the tone of the company's conference call, and its market outlook, as "decidedly sober."  Describing Indalex's first quarter results as lackluster, Goldman Sachs pointed to a number of factors including a 14.6% decrease in sales to the housing and truck/trailer markets which markets represented 60% of Indalex's business.

163.    Indalex's financial crisis was further confirmed later on May 18, 2007 when Indalex filed its 10Q for the first quarter of 2007 ("the 2007 10Q-1").

164.    In that filing, Indalex reiterated the dismal results previewed in the preceding press release and earnings call and reaffirmed that residential construction and remodeling activity had slowed considerably, causing Indalex to be in a "downturn" the end to which it could not predict.

165.    While the 2007 10Q-1 included a brief mention of the sale of AAG completed on May 15, 2007, Indalex stated, simply, that the proceeds from the sale of AAG would be "allocated in accordance with the terms of the [I]ndenture."  The 2007 10Q-1 did not mention that, in accordance with the terms of the MSA signed by Sun's representative, Sun Management received more than $1.5 million from the AAG sale.

166.    The 2007 10Q-1 also did not mention any change in Indalex's position with respect to the payment of dividends as stated in the 10K filed a month earlier, or that it was then investigating whether some or all of the proceeds from the sale of AAG could be diverted to Sun in the form of a dividend.

167.   In addition, the 2007 10Q-1 did not reflect any change in Indalex's stated commitment to ensuring cash generation and improved cash flow from operations in order to preserve and protect Indalex during its recognized economic downturn.

### The Dividend

168.   Consistent with the Indenture governing the Notes, on May 21, 2007 Indalex issued Offers to Purchase up to $71,945,000 in Notes with proceeds from the sale of AAG.

169.   In its Offers to Purchase, Indalex stated that it intended to pay a shareholder dividend exceeding $76 million with the remaining proceeds from the sale of AAG.   There was no mention in the Offers to Purchase of using any of the AAG sale proceeds to pay down the burgeoning revolver.

170.   By unanimous consent dated May 31, 2007, the Sun-controlled Board of Directors of Indalex Holdings Finance, Inc. approved paying Sun and the other shareholders the unprecedented dividend of more than $76 per share.  Despite management's expressed intent to pay down the revolver, there was no mention of saving any of the AAG sale proceeds for that purpose.

171.   Not one of these Directors approving the dividend was disinterested or independent.

172.   Rather, Stubbs and Alger were both Indalex shareholders at the time and, therefore, both of them benefited from their decision to declare the dividend.

173.   The remaining three members of the Board of Directors of Indalex Holdings Finance, Inc. – McElwee, Liff and Terry -- were employees of Sun which, as a result of their actions, received dividends on June 1, 2007 of $34,636,971.43 and $34,636,971.42.

27

174.    The Board of Directors' unanimous consent recited that it is based on an "opinion" of FTI which concluded that Indalex would not be rendered insolvent by the payment of a dividend.

175.    Notably, the FTI letter is not dated until the day after the unanimous consent and, therefore, it is unclear how it could have served as the basis for the Board's decision allegedly reached the day before.

176.    Moreover, the FTI letter is based, in its entirety, on projections and conclusions provided by unidentified members of Indalex's management.  For the purposes of its letter FTI "assumed, without independent verification, that the financial forecasts and projections provided to us have been prepared utilizing reasonable assumptions."  FTI conceded that "[w]e have not independently verified the accuracy and completeness of the information supplied to us with respect to the Companies."

177.    On information and belief, the projections provided to FTI were patently unreasonable in light of, *inter alia,* prior projections produced by or for Indalex in better economic conditions, Indalex's knowledge of the extent of its liquidity crisis, the borrowing capacity on the revolver, Indalex's understanding of the economic conditions it had and would continue to encounter, the results experienced by Indalex's competitors, the overall depressed conditions in the extrusion industry and the independent projections produced by industry analysts at or about the same time.

178.   Despite all of this information, on June 1, 2007 wire transfers totaling $76,627,136.27 issued to or on behalf of the following Indalex's shareholders, as follows:

| | |
|---|---|
| Sun Capital III | $34,636,971.43 |
| Sun Capital IV | $34,636,971.42 |
| Indalex Co-Investment, LLC | $6,894,437.74 |
| Talarico | $114,631.33 |
| Stubbs | $68,809.52 |
| HIG SUN Partners, Inc. | $62,679.43 |
| Alger | $51,645.45 |
| Nelson | $30,956.62 |

179.   On information and belief, the payment of these dividends caused Indalex to be insolvent insofar as the fair value of its liabilities exceeded the fair value of its assets, it was unable to pay its debts when due and/or it was left with unreasonably small capital. The payment of these dividends provided little or no value to Indalex.

**More Payments to Sun**

180.   Thereafter, Sun diverted still more cash from Indalex through the siphoning off of management fees under the MSA signed on Indalex's behalf by a Sun employee. On information and belief, the "management fees" paid to Sun between June 1, 2007 and December 31, 2007 totaled $752,000. As a result, by the end of 2007 Sun had been paid over 80% of the amount of its original investment in Indalex. As with the dividends, these payments provided little or no value to Indalex.

29

181.   Indeed, Sun stripped so much money out of Indalex that on two separate occasions in 2008 (May and November) Sun, through its affiliate Sun Indalex Finance, had to infuse $15 million in cash into Indalex in order to mollify JP Morgan, the administrator of Indalex's revolver borrowings.

182.   Sun characterized these infusions as "term loans."  In the instant bankruptcy, Sun has argued that these amounts are prioritized for repayment with the revolver borrowings and ahead of the Noteholders.

183.   As set forth above, these alleged loans, and Sun's supposed secured or priority position, if any, were obtained while Indalex was insolvent.

184.   On information and belief, Sun also never filed a UCC Financing Statement with respect to either $15 million "term loan."

185.   Despite Indalex's desperate financial situation, Sun Management exacted an additional $150,000 fee for each of these "loans."  Indalex was insolvent when these payments were made as well.

186.   Throughout 2008, Sun Management also continued collecting management fees from Indalex.  As with the transaction fees, these payments were made when Indalex was insolvent.  On information and belief, the total "management fees" paid in 2008 was $749,000.

187.   Indalex's financial situation was so dire that in June 2008 it entered into three sale-leaseback transactions, two of which involved its Connersville, Indiana operation and the other of which involved its City of Industry property.  These transactions resulted in the company receiving a short-term cash infusion totaling $23.9 million in exchange for leases

which were financially disadvantageous to Indalex.  Indeed, as a result of the sale-leaseback of its Connersville facility Indalex recorded an impairment on long-lived assets of $6.2 million.

188.    The sale-leaseback transactions provided Sun yet another opportunity to collect a transaction fee—for these, Sun Management collected another $239,000.

189.    On information and belief, on or about January 5, 2009 Sun, through Sun Management collected its last "management fee" from Indalex.  The amount paid in January 2009 was $250,000.

190.    In February 2009, Indalex advised US Bank as Trustee for the Noteholders that it was unable to make the semi-annual interest payment on the Notes.

191.    On March 20, 2009 the Debtors, among others, filed for protection in the Court under Chapter 11 of the Bankruptcy Code.

## COUNT I
## FRAUDULENT TRANSFERS
## PURSUANT TO 11 USC §§544, 548, 550 and/or 6 Del. C. §§1304 and 1305

**(against Sun, Sun Indalex, Sun Capital III, Sun Capital IV, Krouse, Leder, Stubbs, Alger, Indalex Co-Investment LLC, HIG Sun Partners, Inc., Talarico and Nelson)**

192.    Plaintiff incorporates herein by reference paragraphs 1-191 of the Complaint as if set forth in full.

193.    On information and belief the June 1, 2007 dividends to Sun Capital III, Sun Capital IV, Stubbs, Alger, Indalex Co-Investment LLC, HIG Sun Partners, Inc., Talarico,  and Nelson (described in paragraph 178 herein) are avoidable fraudulent transfers in that:

a. The transfers were made with the actual intent to hinder, delay and defraud creditors;

b. The transfers were made while Indalex was insolvent or rendered Indalex insolvent;

c. The transfers were made without fair consideration;

d. The transfers were for less than reasonably equivalent value;

e. The transfers were made while Indalex had unreasonably small capital; and/or

f. The transfers were made while Indalex intended to incur or believed it would incur debts beyond its ability to pay such debts as they matured.

194.    The above transfers are avoidable pursuant to 11 U.S.C. §§544, 548 and 550 and/or 6 Del. C. §§1304 and 1305.

195.    On information and belief, some or all of the dividends paid to Sun Capital III and Sun Capital IV were subsequently transferred to Sun, Sun Indalex, Krouse and/or Leder either directly, or through companies they own and/or control.

196.    As such, Sun, Sun Indalex, Krouse and/or Leder are immediate or mediate transferees under 11 U.S.C. §550(a).

197.    On information and belief, Indalex knew or should have known that the payment of this dividend did or would render Indalex insolvent.

WHEREFORE, the Plaintiff prays that the above transfers be avoided and that Judgment be entered against the defendants named for the retransfer of the dividends totaling approximately $76 million and for such other relief as this Honorable Court deems may be proper and just.

32

## COUNT II
## FRAUDULENT TRANSFERS
## PURSUANT TO 11 USC §§544, 548, 550 and 6 Del. C. §§1304 and 1305

### (against Sun, Sun Indalex, Sun Management, Krouse and Leder)

198.    Plaintiff incorporates herein by reference paragraphs 1-197 of the Complaint as if set forth in full.

199.    The pre-petition payments to Sun Management on and after June 1, 2007 including, but not limited to, the management fees identified in paragraphs 180, 186 and 189, the transaction fees discussed in paragraphs 185 and 188 and expense reimbursement were unreasonable, excessive and are avoidable in that

a. The transfers were made with the actual intent to hinder, delay and defraud creditors;

b. The transfers were made while Indalex was insolvent or rendered Indalex insolvent;

c. The transfers were made without fair consideration;

d. .Indalex did not receive reasonably equivalent value in exchange for these payments;

e. The transfers were made while Indalex had unreasonably small capital; and/or

f. The transfers were made while Indalex intended to incur or believed it would incur debts beyond its ability to pay such debts as they matured.

200.    The above transfers are avoidable pursuant to 11 U.S.C. §§544, 548 and 550 and/or 6 Del. C. §§1304 and 1305.

201.    On information and belief, some or all of the management fees, transaction fees and expense reimbursements paid to Sun Management were subsequently transferred to Sun, Sun Indalex, Krouse and/or Leder either directly, or through companies they own and/or control.

33

202.    As such, Sun, Sun Indalex, Krouse and Leder are immediate or mediate transferees under 11 U.S.C. §550(a).

203.    On information and belief, Indalex knew or should have known that the payment of these fees did or would render Indalex insolvent.

WHEREFORE, the Plaintiff prays that the above transfers be avoided and that Judgment be entered against Sun, Sun Indalex, Sun Management, Krouse and Leder in the amount of $2,290,000, for attorney's fees and costs and for such other relief as this Honorable Court deems may be proper and just.

## COUNT III
## PREFERENTIAL TRANSFERS PURSUANT TO 11 USC  §§ 547 and 550

### (against Sun, Sun Management, Sun Indalex, Krouse and Leder)

204.    Plaintiff incorporates herein by reference paragraphs 1-203 of the Complaint as if set forth in full.

205.    In the one year preceding the filing of the Petitions, Indalex paid Sun Management approximately $999,000 in management fees and $539,000 in transaction fees.  On information and belief, $250,000 in management fees and all the transaction fees qualify as preferential payments.

206.    On information and belief, Sun, Sun Indalex, Krouse and/or Leder benefited from and/or received some or all the monies paid to Sun Management either directly, or through companies they own and/or control.

207.    As such, Sun, Sun Indalex, Krouse and Leder are immediate or mediate transferees under 11 U.S.C. §550(a).

34

208.     Sun, Sun Indalex, Krouse, Leder and Sun Management are insiders within the definition of 11 U.S.C. §101(31).

209.     The transfers are avoidable preferences in that they were transfers of an interest of the debtor in property:

a.      to or for the benefit of a creditor;

b.      for or on account of an antecedent debt owed by the debtor before such transfer was made;

c.      made while the debtor was insolvent;

d.      made within one year before the date of the filing of the petition, to an insider; which

e.      enabled Sun Management, Sun, Sun Indalex, Krouse and/or Leder to receive more than such creditor would receive if--

(1) the case were a case under chapter 7 of title 11;

(2) the transfer had not been made; and

(3) such creditor received payment of such debt to the extent provided by the provisions of title 11.

WHEREFORE, the Plaintiff prays that this Honorable Court enter judgment against Sun, Sun Indalex, Krouse, Leder and Sun Management in the amount of $789,000, plus attorney's fees and costs and for such other relief as this Honorable Court deems may be proper and just.

## COUNT IV
## RETURN OF POST-PETITION PAYMENTS

**(against Sun, Sun Indalex Finance, Sun Capital III, and Sun Capital IV)**

210.    Plaintiff incorporates herein by reference paragraphs 1-208 of the Complaint as if set forth in full.

211.    On or about May 21, 2008 Sun Indalex Finance advanced $15 million to Indalex.

212.    Although this cash infusion was characterized as a secured term loan, on information and belief, Sun Indalex Finance did not contemporaneously receive security for this advance.

213.    Moreover, on information and belief, Sun Indalex Finance never filed a UCC financing statement reflecting its alleged security interest.

214.    On or about November 25, 2008 Sun Indalex Finance advanced another $15 million to Indalex.

215.    Although this cash infusion was characterized as a secured term loan, on information and belief, Sun Indalex Finance did not contemporaneously receive security for this advance.

216.    Moreover, on information and belief, Sun Indalex Finance never filed a UCC financing statement reflecting its alleged security interest.

217.    Notwithstanding the above, Sun and/or Sun Indalex Finance contend that one or more of them have a security interest as a result of the infusions of cash.  This alleged security interest is referenced in the Final Order Authorizing the Debtors to Obtain Post-Petition Financing ("Final Order") dated May 1, 2009.

36

218.    Apparently in reliance on the Final Order, and representations contained therein including in paragraph 6 thereof, Sun and/or Sun Indalex Finance received payments in or around October 2009, post-petition, of at least $1.8 million.  Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV also received in July 2010, or will receive in excess of $4 million from the Debtors based on this alleged security interest.

219.    Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV may also have received further payments following the Petition Date based on this alleged security interest.

220.    In accordance with paragraph 20 of the Final Order, Plaintiff specifically contests the propriety of this alleged security interest/pledge and those paragraphs of the Final Order which relate thereto including, but not limited to, paragraph 6 of the Final Order.

221.    Because neither Sun nor Sun Indalex Finance have a perfected security interest with respect to the May 2008 or November 2008 transactions, all payments made to Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV based on such security interests should be returned to the estate.

WHEREFORE, the Plaintiff prays that this Honorable Court require Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV to return to the estate all monies it has or will receive, post-petition, as a result of the alleged security interest.

## COUNT V
## RECHARACTERIZATION OF DEBT TO EQUITY AND RETURN OF PAYMENTS PURSUANT TO 11 USC §105(a)

### (against Sun, Sun Indalex Finance, Sun Capital III, and Sun Capital IV )

222.    Plaintiff incorporates herein by reference paragraphs 1-218 of the Complaint as if set forth in full.

37

223.    As set forth above, in May and November 2008, Sun, through Sun Indalex Finance, made cash infusions into Indalex totaling $30 million.

224.    At the time of these infusions, Indalex was undercapitalized and insolvent.

225.    At the time of these infusions, Sun controlled Indalex and was its sole voting shareholder, or controlled that shareholder.

226.    These infusions were used to pay down existing Indalex debt.

227.    On information and belief, there was no contemporaneous pledge of assets by Indalex with respect to these infusions of cash.

228.    The infusions were made at a time when Indalex could not obtain financing from any other source.

229.    On information and belief, it was anticipated that the infusions were to be repaid from Indalex's earnings.

230.    On information and belief, no sinking fund was established to ensure repayment of the infusions.

231.    The cash infusions, which were necessitated by Sun's own greed, have been treated ahead of debt owed to the Noteholders and all of the Debtors' unsecured creditors.

232.    As a result, Sun and/or Sun Indalex Finance received at least $1.8 million in or around October 2009 from the post-petition sale of assets to SAPA.  Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV have received in July 2010 or will receive further payments in excess of $4 million as a result of a working capital adjustment relating to the sale of assets to SAPA.  Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV may also

38

have received further payments following the Petition Date based on this alleged security interest.

233.    Because the cash infusions should be treated as equity rather than debt, all monies paid to Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV on account of these infusions should be returned to the Debtors' estates.

WHEREFORE, the Plaintiff prays that this Honorable Court enter judgment recharacterizing Sun's debt to equity, awarding Plaintiff the return of all monies to Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV as a result of the prior characterization of these infusions as secured debt plus attorney's fees and costs and for such other relief as this Honorable Court deems may be proper and just.

**COUNT VI**
**EQUITABLE SUBORDINATION**
**PURSUANT TO 11 USC §510(c)**

**(against Sun and Sun Indalex Finance)**

234.    Plaintiff incorporates herein by reference paragraphs 1-230 of the Complaint as if set forth in full.

235.    As set forth above, after February 2, 2006, Sun was able to strip tens of millions of dollars out of Indalex because of its control over Indalex's business, Board of Directors and management.

236.    Sun's actions caused Indalex to be undercapitalized.

237.    Indeed, Sun's actions caused Debtors' business to fail.

238.    In view of all of the inequitable conduct heretofore set forth, all of which conduct caused Indalex injury and conferred unfair benefits on Sun, the claims of Sun and/or Sun Indalex

39

Finance should be subordinated to those claims of all unsecured creditors pursuant to 11 U.S.C. §510(c).

239.    Equitable subordination of these claims is not inconsistent with the provisions of the Bankruptcy Code.

240.    Sun and Sun Indalex Finance should also be required to remit to the estate all monies it already received from the estate.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Sun and Sun Indalex Finance for all monies received from the Debtors, that this Court subordinate Sun and/or Sun Indalex Finance's claims to those of unsecured creditors, for attorneys' fees and costs, and for such other relief as this Honorable Court deems may be proper and just.

### COUNT VII
### BREACH OF FIDUCIARY DUTY

**(against Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan)**

241.    Plaintiff incorporates herein by reference paragraphs 1-237 of the Complaint as if set forth in full.

242.    During the three years preceding the petition date, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan served on the Board of Directors of Indalex Holdings Finance, Inc.

243.    During the three years preceding the petition date, Sun, through Sun Indalex, was the controlling shareholder of Indalex Holdings Finance, Inc.

40

244.    As members of the Board and as controlling shareholder, Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan had a fiduciary duty to Indalex and its shareholders.

245.    As members of the Board and as controlling shareholders when Indalex was insolvent Sun, Sun Indalex, Terry, Liff, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan also had a fiduciary duty to Indalex's creditors.

246.    As fiduciaries Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan were bound to act with good faith, with due care and for the common good of those to whom they had duties.

247.    On information and belief, in breach of their duties, Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan acted improperly by, among other things:

--    charging, or allowing Indalex to be charged, management fees that were excessive, unfair, not related to management services actually provided by Sun Management and/or not the result of fair dealing;

--    charging or allowing Indalex to be charged transaction fees that were excessive, unfair, not related to any services performed in conjunction with the transactions and/or not the result of fair dealing; and

--    failing to ensure that Indalex's financial statements accurately represented Indalex's financial condition by listing Indalex's assets and liabilities at fair value.

248.    On information and belief, in breach of their duties, Sun, Sun Indalex, Stubbs, Alger, Terry, Liff and McElwee also acted improperly by, among other things:

41

--      taking or permitting the distribution of an exorbitant dividend to insiders which was not the result of fair dealing;

--      taking or permitting the distribution of an exorbitant dividend to insiders which resulted in Indalex becoming insolvent;

--      taking or permitting the distribution of an exorbitant dividend to insiders without ensuring the payments were for reasonably equivalent value;

--      taking or permitting the distribution of an exorbitant dividend to insiders despite management's commitment to use proceeds from the sale of AAG to pay down Indalex's revolver borrowings which would have had the effect of decreasing Indalex's overwhelming interest obligations;

--      taking or permitting the distribution of an exorbitant dividend to insiders despite the "red flags" regarding the economic conditions and challenges Indalex was and was expected to experience going forward;

--      taking or permitting the distribution of an exorbitant dividend to insiders without considering all material facts reasonably available to them and/or in conscious disregard of those facts;

--      failing to be active monitors of Indalex's corporate performance and of the effects of this dividend on Indalex;

 --      taking or permitting the distribution of an exorbitant dividend to insiders rather than utilizing the monies to be retained as working capital or for other purposes for Indalex;

--      approving the grant of dividends to themselves;

42

--      approving the grant of stock options to themselves; and

--      failing to maximize the economic value of Indalex.

249.    On information and belief, in breach of their duties, Sun, Sun Indalex, Terry, Liff, Stubbs, Alger, Lawlor, Skillen and Finnigan also acted improperly by, among other things:

--      entering into sale-leaseback transactions which were financially disadvantageous to Indalex but which benefited Sun; and

--      allowing Sun and/or Sun Indalex Finance to secure an alleged priority lien and security interest and to improperly characterize its equity infusions as debt.

250.    As a direct result of these actions, Indalex paid Sun over $85 million and lost the benefit of these revenues.

251.    As fiduciaries, Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan were also bound to (a) conduct the affairs of Indalex without fraud or mismanagement (b) properly oversee and account for Indalex's monies and (c) perform their duties for the benefit of Indalex.

252.    In breach of their duties, Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan conducted the affairs of Indalex for their benefit, and/or the benefit of Sun, rather than for the benefit of Indalex.

253.    As a direct and proximate result of this behavior, Indalex's business has been destroyed, Indalex was driven insolvent and the creditors' interests have been impaired.

254.    The behavior of Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan constitutes a gross abuse of discretion and gross negligence.

255.    The conduct of Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan was extreme and outrageous, justifying the imposition of punitive damages.

256.    The series of self-dealing transactions approved by Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan remove them from the protections, if any, of the business judgment rule.

257.    The actions of these defendants are not sustainable under the entire fairness doctrine.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan, jointly and severally, for an amount to be determined and for attorneys' fees and costs and other relief that this Honorable Court deems may be proper and just.

## COUNT VIII
## BREACH OF THE DUTY OF LOYALTY

**(against Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan)**

258.    Plaintiff incorporates herein by reference paragraphs 1-254 of the Complaint as if set forth in full.

259.    Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan had a duty of undivided loyalty to Indalex at all relevant times herein.

44

260.    In breach of this duty, and as set forth more fully herein, Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan improperly acted for their own benefit, or for the benefit of their employer Sun, by, among other things:

--    charging, or allowing Indalex to be charged, management fees that were excessive and not fair;

--    charging, or allowing Indalex to be charged, management fees pursuant to an agreement which was not negotiated at arm's-length and which was executed on Indalex's behalf by a Sun representative;

--    charging or allowing Indalex to be charged transactions fees which were excessive and not fair;

--    charging, or allowing Indalex to be charged, transaction fees pursuant to an agreement which was not negotiated at arm's-length and which was executed on Indalex's behalf by a Sun representative;

--    failing to ensure that Indalex's financial statements accurately represented Indalex's financial condition by listing Indalex's assets and liabilities at fair value;

--    taking or permitting the distribution of an exorbitant dividend to insiders which was not the result of fair dealing;

--    taking or permitting the distribution of an exorbitant dividend to insiders which resulted in Indalex becoming insolvent;

--    taking or permitting the distribution of an exorbitant dividend to insiders without ensuring the payments were for reasonably equivalent value;

45

--      taking or permitting the distribution of an exorbitant dividend to insiders despite management's commitment to use proceeds from the sale of AAG to pay down Indalex's revolver borrowings which would have had the effect of decreasing Indalex's overwhelming interest obligations;

--      taking or permitting the distribution of an exorbitant dividend to insiders despite the "red flags" regarding the economic conditions and challenges Indalex was and was expected to experience going forward;

--      taking or permitting the distribution of an exorbitant dividend to insiders without considering all material facts reasonably available to them and/or in conscious disregard of those facts;

--      failing to be active monitors of Indalex's corporate performance and of the effects of this dividend on Indalex;

--      taking or permitting the distribution of an exorbitant dividend to insiders rather than utilizing the monies to be retained as working capital or for other purposes for Indalex;

--      approving the grant of dividends to themselves;

--      approving the grant of stock options to themselves;

--      failing to maximize the economic value of Indalex.

--      entering into sale-leaseback transactions which were financially disadvantageous to Indalex but which benefited Sun; and

--      allowing Sun and/or Sun Indalex Finance to secure an alleged priority lien and security interest and to improperly characterize its equity infusions as debt.

46

261.    As a direct and proximate result of the aforesaid self-dealing, Indalex's business has been destroyed and the creditors' interests have been impaired.

262.    The behavior of Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan constitutes gross negligence.

263.    The conduct of Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan was extreme and outrageous, justifying the imposition of punitive damages.

264.    The series of self-dealing transactions approved by Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan remove them from the protections, if any, of the business judgment rule.

265.    The actions of these defendants are not sustainable under the entire fairness doctrine.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Sun, Sun Indalex, Leder, Krouse, Terry, Liff, Gillen, Kreilein, Stubbs, Alger, McElwee, Lawlor, Skillen and Finnigan, jointly and severally, for an amount to be determined and for attorneys' fees and costs and other relief that this Honorable Court deems may be proper and just.

## COUNT IX
## PREFERENTIAL TRANSFERS PURSUANT TO 11 USC §§547 and 550

### (against Sun, Sun Capital III, Sun Capital IV, Krouse and Leder)

266.    Plaintiff incorporates herein by reference paragraphs 1-262 of the Complaint as if set forth in full.

47

870160_4

267.     On information and belief, in the one year preceding the filing of the Petitions, Indalex paid Sun Capital III and Sun Capital IV $75,000 each.

268.     On information and belief, Sun, Krouse and/or Leder benefited from and/or received some or all the monies paid to Sun Capital III and Sun Capital IV.

269.     On information and belief, Sun, Krouse and Leder are immediate or mediate transferees of Sun Capital III and Sun Capital IV.

270.     Sun, Sun Capital III, Sun Capital IV, Krouse and Leder are insiders within the definition of 11 U.S.C. §101(31).

271.     The transfers are avoidable preferences in that they were transfers of an interest of the debtor in property:

a.     to or for the benefit of a creditor;

b.     for or on account of an antecedent debt owed by the debtor before such transfer was made;

c.     made while the debtor was insolvent;

d.     made within one year before the date of the filing of the petition, to an insider; which

e.     enabled Sun, Sun Capital III, Sun Capital, IV, Krouse and/or Leder to receive more than such creditor would receive if--

(1) the case were a case under chapter 7 of title 11;

(2) the transfer had not been made; and

(3) such creditor received payment of such debt to the extent provided by the provisions of title 11.

48

WHEREFORE, the Plaintiff prays that this Honorable Court enter judgment against Sun, Sun Capital III, Sun Capital IV, Krouse and, Leder in the amount of $150,000, plus attorney's fees and costs and for such other relief as this Honorable Court deems may be proper and just.

## COUNT X
## OBJECTION TO STIPULATION IN FINAL ORDER

272.    Plaintiff incorporates herein by reference paragraphs 1-268 of the Complaint as if set forth in full.

273.    On May 1, 2009 this Court entered the Final Order.

274.    Paragraph 20 of the Final Order recites that the stipulations and admissions contained therein are binding on all the parties including any subsequently appointed Chapter 7 Trustee unless an adversary is timely filed and the Trustee prevails.

275.    Plaintiff objects to the validity of the stipulations and admissions set forth in the Final Order as they may affect the claims set forth herein.  This objection includes, but is not limited to, the stipulations and admission in paragraph 6 of the Final Order.

## COUNT XI
## DECLARATORY JUDGMENT
## PURSUANT TO 28 USC §§2201 and 1332

276.    Plaintiff incorporates herein by reference paragraphs 1-272 of the Complaint as if set forth in full.

277.    As set forth above, Sun and/or Sun Indalex Finance has already been paid $1.8 million, and Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV have been or are about to be paid an additional $4 million in working capital adjustments of the Debtors' property, and may have received additional funds postpetition on account of the alleged security interest.

49

278.    The payments to Sun, Sun Indalex Finance, Sun Capital III, and/or Sun Capital IV have adversely affected the Debtors' creditors.

279.    Plaintiff contests Sun and/or Sun Indalex Finance's purported lien.

280.    Debtors' creditors are and will continue to be adversely affected by Sun Indalex Finance's purported lien.

281.    The validity of Sun Indalex Finance's lien is a substantial justiciable controversy.

282.    Sun Indalex Finance and Debtors have adverse legal interests.

283.    These adverse legal interests are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

WHEREFORE, Plaintiff prays that this Honorable Court enter a declaratory judgment determining the validity, extent, and priority of secured claims asserted by Sun and/or Sun Indalex Finance.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on those claims for which it is available.


Dated: July 30, 2010                                   DILWORTH PAXSON LLP

                                                       /s/ Peter C. Hughes
                                                       Peter C. Hughes (No. 4180)
                                                       One Customs House – Suite 500
                                                       704 King Street
                                                       P. O. Box 1031
                                                       Wilmington, DE  19801
                                                       (302) 571-9800
                                                       (302) 571-8875 (fax)

                                                       and

/s/ Maura Fay McIlvain

Maura Fay McIlvain (*pro hac* admission to be requested)
Peter C. Hughes
1500 Market Street, Suite 3500E
Philadelphia, PA  19102
(215) 575-7000
(215) 575-7200 (fax)