## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **IN RE: IH 1, Inc.,** *et al.,* | : | **CASE NO. 09-10982-PJW** |
| | : | |
| **Debtors** | : | |
| | : | |
| **GEORGE L. MILLER,** | : | |
| **Chapter 7 Trustee,** | : | **ADVERSARY NO.  10-52279-PJW** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SUN CAPITAL PARTNERS, INC., et al.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Defendants.** | : | |

## THE SUN CAPITAL DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION TO DISQUALIFY KIRKLAND & ELLIS LLP

John F. Hartmann, P.C.
Michael A. Duffy
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Daniel J. DeFranceschi (No. 2732)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Dated:  December 10, 2010

*Attorneys for the Sun Capital Defendants (as defined herein)*

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ............................................................................................5

ARGUMENT .....................................................................................................................7

I.     INDALEX CONSENTED TO AND WAIVED ANY ALLEGED CONFLICT
       ARISING FROM KIRKLAND'S REPRESENTATION OF SUN CAPITAL..................9

       A.     Indalex Executed A Written Retention Agreement That Meets All Of The
              Requirements Of A Valid Waiver...........................................................................9

       B.     Indalex Knowingly And Voluntarily Agreed To The Conflict Waiver.................15

II.    PLAINTIFF'S CLAIMS IN THIS ADVERSARY PROCEEDING ARE NOT
       "SUBSTANTIALLY RELATED" TO KIRKLAND'S PREPETITION WORK
       FOR INDALEX. ......................................................................................................19

III.   PLAINTIFF DOES NOT AND CANNOT SHOW THAT KIRKLAND
       OBTAINED ANY CONFIDENTIAL INFORMATION FROM INDALEX
       THAT WOULD MATERIALLY AFFECT THESE PROCEEDINGS. ...........................24

IV.    PLAINTIFF HAS IMPLIEDLY WAIVED ANY ALLEGED CONFLICT OF
       INTEREST.................................................................................................................26

V.     DISQUALIFYING KIRKLAND WOULD UNFAIRLY PREJUDICE SUN
       CAPITAL....................................................................................................................30

CONCLUSION................................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Bagdan v. Beck,*
    140 F.R.D. 660 (D.N.J. 1991) .................................................................. 25, 26

*Brennan's Inc. v. Brennan's Restaurants, Inc,*
    590 F.2d 168 (5th Cir. 1979).................................................................. 25

*Carnegie Hill Fin., Inc. v. Krieger,*
    99-CV 2592, 2000 WL 10446 (E.D. Pa. Jan. 5, 2000) ........................... 24

*Celgene Corp. v. KV Pharmaceutical Co.,*
    No. 07-4819, 2008 WL 29347415 (D.N.J. July 29, 2008)....................... 14

*Concat LP v. Unilever PLC,*
    350 F. Supp. 2d 796 (N.D. Ca. 2004)...................................................... 14

*Conley v. Chaffinch,*
    413 F. Supp. 2d 494 (D. Del. 2006) ......................................................... 7

*Construcciones Haus Soceidad v. Kennedy Funding Inc.,*
    07-cv-0392, 2008 WL 1882857 (D.N.J. April 24, 2008)....................... 10

*Deptula v. Steiner, No. Civ.A.02C09006RFS,*
    2003 WL 23274846 (Del. Super. Ct. Dec. 15, 2003)......................... 8, 30

*Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.,*
    142 F. Supp. 2d 579 (D. Del. 2001) .............................................. 7, 26, 30

*Express Scripts, Inc. v. Crawford, No. 2663-N,*
    2007 WL 417193 (Del. Ch. Jan. 25, 2007) .......................................... 30

*Fed. Home Loan Mortgage Corp. v. La Conchita Ranch Co.,*
    68 Cal. App. 4th 856 (Cal. Ct. App. 1998) ............................................ 17

*In re Appeal of Infotechnology, Inc.,*
    582 A.2d 215 (Del. 1990)......................................................................... 8

*In re Kaiser Group,*
    272 B.R. 846................................................................................... 26, 29

*In re Muma Servs., Inc.,*
    286 B.R. 583 (Bankr. D. Del. 2002) ...................................................... 26

*Integrated Health Servs. of Cliff Manor, Inc. v. THCI, Co.,*
    327 B.R. 200 (D. Del. 2005) ..................................................................... 7

*Kirby v. Kirby,*
    1987 WL 14862 (Del. Ch. July 29, 1987)................................................................ 24

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's),*
    Adv. Proc. No. 08-51402 KG, (Bankr. D. Del. Oct. 1, 2009)............................. passim

*MJK Family LLC v. Corp. Eagle Mgmt. Servs., Inc.,*
    676 F. Supp. 2d 584 (E.D. Mich. 2009) ................................................................. 17

*Rissman v. Rissman,*
    213 F.3d 381 (7th Cir. 2000)................................................................................... 11

*Royale Luau Resort, LLC v. Kennedy Funding, Inc.,*
    07-1342, 2008 WL 482327 (D.N.J. Feb. 19, 2008) ................................................ 10

*Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,*
    652 F. Supp. 1281 (D. Del. 1987) ........................................................................... 24

*Schwartz v. Industrial Valley Ins. Co.,* No. 96-CV-5677,
    1997 WL 330366 (E.D. Pa. June 5, 1997) .............................................................. 14

*Ulico Cas. Co. v. Wilson, Elser, Maskowitz, Edelman & Dicker,*
    843 N.Y.S.2d 749 (N.Y. App. Div. 2007)............................................................... 13

*United States v. Hatfield,* No. 06-CR-0550,
    2009 WL 3806300 (E.D.N.Y. Nov. 13, 2009) ....................................................... 17

*United States v. Miller,*
    624 F. 2d 1198 (3d Cir. 1980)................................................................................. 31

*Westinghouse Elec. Corp. v. Gulf Oil Corp.,*
    588 F.2d 221 (7th Cir. 1978) .................................................................................. 14

*Westinghouse Elec. Corp. v. Kerr-McGee,*
    580 F.2d 1311 (7th Cir. 1978) ................................................................................ 14

**Statutes**

11 U.S.C. § 544................................................................................................................ 30

11 U.S.C. § 548................................................................................................................ 30

**Other Authorities**

Annotated Model Rules of Professional Conduct (6th ed.) ............................................... 7

*Black's Law Dictionary* 175 (6th ed. 1990)........................................................... 10, 11

Model Rule of Professional Conduct 1.9........................................................... passim

New York Bar Association's Committee on Professional and Judicial Ethics,
    Formal Op. 2006-1 ................................................................................................................ 13

iv

The Sun Capital Defendants[1] submit this brief in opposition to plaintiff's motion to disqualify their chosen counsel, Kirkland & Ellis LLP ("Kirkland"), from representing them in this adversary proceeding.  In support of this brief, the Sun Capital Defendants also submit the declarations of Michael Alger, Douglas Gessner, and James Stempel.

## INTRODUCTION

Motions to disqualify are disfavored and subject to a high bar because they seek to deprive clients of their counsel of choice and pose the risk of an ulterior, abusive purpose. Plaintiff's motion to disqualify Kirkland fails to satisfy the stringent standards for disqualification.  It also raises the obvious question of whether it was filed as a litigation tactic— an effort by plaintiff to gain an unfair advantage in this litigation.

The heightened judicial skepticism applicable to motions to disqualify is fully justified in this case.  Here, plaintiff seeks disqualification of Kirkland even though Indalex executed a written retention agreement with Kirkland that explicitly waived the conflict plaintiff now asserts.  Plaintiff challenges that written waiver even though Judge Gross recently upheld and enforced an identical waiver, and denied a similar motion to disqualify Kirkland in another bankruptcy proceeding in this district.  In doing so, plaintiff ventures where the debtors and the Official Committee of Unsecured Creditors (the "Committee") did not go before him.  Like plaintiff, the debtors and the Committee long knew that Kirkland performed prepetition legal work for Indalex and that Kirkland was representing the Sun Capital Defendants in these bankruptcy proceedings.  Yet, neither sought disqualification of Kirkland.  Indeed, the Committee's fee petitions reveal that it specifically considered the instant conflict question, including Indalex's written conflict waiver, and decided not to file a motion to disqualify

---

[1]    For purposes of this brief, "Sun Capital Defendants" refers collectively to all defendants except Timothy J. Stubbs and Patrick Lawlor.

Kirkland.  Unlike plaintiff, the debtors and the Committee respected and acted in accordance with Indalex's conflict waiver.

Meanwhile, time passed, and Sun Capital invested a substantial amount of time and money in Kirkland, one of its principal outside law firms and its counsel of choice for these proceedings.  Kirkland, in turn, invested a substantial amount of time and effort in representing the Sun Capital Defendants in these proceedings and to the defense of the very claims asserted in plaintiff's complaint.  The debtors commenced this bankruptcy proceeding approximately 20 months ago, in March 2009, and from the very beginning listed Kirkland as Sun Capital's counsel on their mandatory service list for all pleadings.  Almost immediately, counsel for the debtors and the Committee commenced discussions with Kirkland regarding potential claims against one or more of the Sun Capital Defendants, and those discussions continued for a period of many months.  Indeed, Kirkland, on behalf of the Sun Capital Defendants, negotiated and executed several stipulations that gave the debtors and the Committee additional time to investigate potential claims.  Those discussions continued until August 2009, when the Committee obtained derivative standing to pursue claims on behalf of the debtors and, thereafter, provided Kirkland with a draft complaint.  Even a cursory review of that draft demonstrates that it served as a model for plaintiff's complaint in this adversary proceeding.  In short, over a year ago, counsel for the debtors, the Committee, and Kirkland spent months discussing the same claims plaintiff asserts here.  The debtors and the Committee never once objected to Kirkland's representation of the Sun Capital Defendants, and Kirkland has been preparing to meet plaintiff's claims ever since.

Even that is not the whole story.  Plaintiff himself was appointed more than a year ago, on October 30, 2009, and because he stands in the shoes of the debtors, he cannot plead

2

ignorance of the debtors' knowledge of and dealings with Kirkland in the latter's role as counsel for the Sun Capital Defendants. Even if he could, the record shows that plaintiff and his lawyers have been dealing with Kirkland as counsel for the Sun Capital Defendants almost from the day they were appointed. Dilworth Paxson's fee petitions demonstrate that plaintiff's counsel was reviewing Kirkland emails on a host of issues as early as December 2009. In the winter and spring of 2010, plaintiff sought and obtained from Kirkland documents related to his claims in this case. In April 2010, plaintiff and his counsel sent Kirkland a global settlement proposal that would have resolved the claims that plaintiff asserts against the Sun Capital Defendants in this case. Not once during this period did plaintiff or his counsel raise a conflict issue or object to Kirkland's representation of the Sun Capital Defendants. In fact, plaintiff did not raise a conflict concern with Kirkland until August 16, 2010, after global settlement negotiations went nowhere and after plaintiff had filed his adversary complaint. Wholly apart from Indalex's express written waiver of any conflict, this failure to act amounts to an implied waiver of the alleged conflict that plaintiff belatedly asserts.

Now, more than twenty months into these bankruptcy proceedings, plaintiff seeks disqualification of Kirkland on the grounds that his claims in this action are "substantially related" to prepetition matters that Kirkland handled for Indalex. Plaintiff strains to make this argument, and it is superficial. Like the Committee's draft complaint before it, plaintiff's complaint rests on three principal allegations: (1) that a May 31, 2007 dividend rendered Indalex insolvent; (2) that before and after it was allegedly insolvent, Indalex paid management and transaction fees to a Sun Capital affiliate that were unsupported and ill-advised; and (3) that two secured loans made by a Sun Capital affiliate to Indalex in 2008 should be recharacterized as equity infusions. Simply put, although Kirkland did some work for Indalex related to the May

3

2007 dividend, it did not and could not advise Indalex on the financial wisdom or propriety of that dividend, let alone on its impact on Indalex's solvency. Similarly, while Kirkland provided some assistance to Indalex relating to the 2008 loans, it did not document those transactions and its work had nothing to do with whether those capital infusions are properly characterized as debt or equity. Kirkland did not do *any* work for Indalex relating to management or transaction fees.

That plaintiff's claims in this action are not "substantially related" to Kirkland's pre-petition work for Indalex is only underscored by plaintiff's complete failure to identify even a single item of confidential information that Kirkland obtained while representing Indalex that would somehow give the Sun Capital Defendants an unfair advantage in this litigation absent disqualification of Kirkland. On this point, plaintiff offers not a shred of evidence, just implausible speculation. This is hardly surprising, since Sun Capital, through its affiliates, was Indalex's single largest investor, its representatives held several seats on Indalex's board of directors, and a Sun Capital affiliate provided ongoing management and consulting services to Indalex pursuant to a management services agreement. Given these roles and responsibilities, all of which required continuous dealings with Indalex's officials and operations, it is difficult to conceive of *any* information that Sun Capital would not have received, or was not entitled to receive, from Indalex regarding the transactions at issue in the complaint. For this reason, plaintiff does not even try to argue that he will be unfairly prejudiced by Kirkland's representation of the Sun Capital Defendants in this action.

The Sun Capital Defendants, on the other hand, will be severely and unfairly prejudiced if Kirkland is disqualified, particularly at this late juncture in these proceedings. Disqualification would, in effect, punish the Sun Capital Defendants and Kirkland for relying on an express written waiver from Indalex and, at the same time, reward plaintiff and his predecessors in

4

interest—in whose shoes he stands—for their failure to raise this putative conflict issue long ago. Kirkland has now invested many months of effort in preparing Sun Capital's defense of this action, and Sun Capital has invested the same amount of time and a substantial amount of money in Kirkland.  Given the complex facts and transactions involved, it is unreasonable to expect that a new law firm could get up to speed without substantial time and effort (much of which would be duplicative) and without compromising Sun Capital's ability to defend itself.  Disqualifying Kirkland would send the Sun Capital Defendants back to square one.  That, ultimately, is the purpose of plaintiff's motion, and that is one of the principal reasons why it should be denied.

## FACTUAL BACKGROUND

Sun Capital has long been one of Kirkland's largest clients.  (12/8/10 Declaration of Douglas C. Gessner ("Gessner Decl.") at ¶ 1)  Kirkland began representing Sun Capital more than a decade ago, in February 2000.  (*Id.*)

In August 2005, Sun Capital asked Kirkland to represent it and certain of its affiliated private investment funds in Sun Capital's effort, along with other investors, to acquire Indalex from a subsidiary of Honeywell International Inc.  (*Id.* at ¶ 2)  That effort was successful, and the acquisition closed on February 2, 2006.  (*Id.*)  Upon closing, Sun Capital, through its affiliated funds' investments in Sun Indalex, LLC, owned more than 90% of the outstanding common stock of Indalex Holdings Finance, Inc., the holding company that oversaw the operations of the all of the Indalex companies.  (*Id.* at ¶ 4)  As a result, Sun Capital representatives held a majority of the seats on the board of directors of Indalex Holdings Finance, Inc. and each of the Indalex subsidiaries.  (*Id.*)

Kirkland did not perform any legal services for Indalex before the February 2, 2006 closing.  (*See id.* at ¶ 3)  Upon the closing, however, Kirkland began performing a variety of

5

legal work for Indalex pursuant to a written retention agreement that contained a detailed and explicit conflict waiver relating to matters involving Sun Capital. (*Id.* at ¶ 8; *see also id.*, Ex. B (2/2/06 Retention Agreement) at 4)  That conflict waiver made clear to Indalex that Kirkland had a close and continuing professional relationship with Sun Capital:

> As you know we have represented and represent Sun Capital Partners, Inc. and its affiliated investment funds and management companies (together "Sun") on a variety of matters, including Sun's investment in you and anticipate that we will represent Sun in future matters.  You are a portfolio company of Sun.  This confirms that K&E LLP has informed you of its representation of Sun on a variety of matters, including Sun's investment in you . . . ."

(Gessner Decl., Ex. B at 4)

Thereafter, the written agreement set forth an explicit waiver provision that encompassed past, present and future conflicts arising from Kirkland's representation of Sun Capital:

> [Y]ou consent to, and waive any conflict or other objection with respect to K&E LLP's representation of Sun, its affiliates or portfolio companies in connection with any and all (i) matters in which K&E LLP currently represents Sun, its affiliates or portfolio companies, including the Indalex matters, (ii) past matters in which K&E LLP represented you, Sun, Sun's affiliates or Sun's portfolio companies (or any combination thereof) and (iii) future matters in which K&E LLP might represent Sun (whether or not such matter is related to the Indalex Matters).

(*Id.*)

Next, the agreement confirmed that, in the event of a conflict relating to Sun Capital, Kirkland could terminate its representation of Indalex and continue to represent Sun Capital, including in matters relating to Indalex:

> [Y]ou understand and agree[] that in the event that K&E LLP or Sun determine that any conflict exists in connection with K&E LLP's representation of you, K&E LLP may terminate its representation of you and continue its representation of Sun in any matter (whether or not such matter is related to the Indalex Matters).

6

(*Id.*)

Finally, the retention agreement expressly cautioned Indalex that Kirkland is "not advising you with respect to this Agreement because we would have a conflict of interest in doing so. If you wish advice, you should consult independent counsel of your choice." (*Id.* at 5)

## ARGUMENT

While this Court has discretion to disqualify an attorney for a violation of the ethical rules, "motions to disqualify are generally disfavored." *Integrated Health Servs. of Cliff Manor, Inc. v. THCI, Co.*, 327 B.R. 200, 204 (D. Del. 2005) (affirming bankruptcy court's refusal to disqualify counsel); *see also* Annotated Model Rules of Professional Conduct (6th ed.) at 10 ("The violation of an ethics rule, however, is not enough to warrant the drastic remedy of disqualification."). Accordingly, the party seeking the drastic sanction of disqualification must "clearly show that continued representation would be impermissible." *Integrated Health Servs.*, 327 B.R. at 204 (internal quotation marks and alterations omitted). "Vague and unsupported allegations are not sufficient to meet this standard." *Conley v. Chaffinch*, 413 F. Supp. 2d 494, 496 (D. Del. 2006) (internal citations omitted).

There are good reasons for this strict standard. *Mervyn's LLC v. Lubert-Adler Group IV, LLC*, (*In re Mervyn's*) Adv. Proc. No. 08-51402 KG, slip op. at 14 (Bankr. D. Del. Oct. 1, 2009). One is that disqualification denies a party the lawyer of its choice. *Id.* Another is the unfortunate reality that "motions for disqualification are frequently filed as 'dilatory tactics intended to divert the litigation from attention to the merits.'" *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 584 (D. Del. 2001); *see also In re Mervyn's*, slip op. at 14 ("Disqualifications are disfavored for good reasons, most importantly because a party is denied the lawyer of its choice and there is the potential for abuse."); *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 220 (Del. 1990) ("[T]he purpose of the Rules [of

7

Professional Conduct] can be subverted when they are invoked by opposing parties as procedural weapons."); *Deptula v. Steiner*, No. Civ.A.02C09006RFS, 2003 WL 23274846, at *1 (Del. Super. Ct. Dec. 15, 2003) ("The Court must be wary so as to prevent motions to disqualify from being used as just another weapon in the litigation arsenal.").

Plaintiff's motion to disqualify Kirkland highlights these concerns. Plaintiff argues that Kirkland's representation of the Sun Capital Defendants violates Model Rule of Professional Conduct 1.9, the purpose of which is to protect client confidences by prohibiting lawyers from "switching sides" in the same or a "substantially related" matter. Model Rule 1.9 provides in relevant part:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent [a client] in the same or a substantially related matter in which that person's interests are materially adverse to the interest of the former client unless the former client gives informed consent, confirmed in writing.

Model Rules of Prof'l Conduct R. 1.9. Plaintiff argues that his claims in this action are "substantially related" to prepetition work that Kirkland did for Indalex, and that Indalex did not knowingly consent to this alleged conflict.

As explained herein, plaintiff's disqualification argument fails to meet the stringent standards for disqualification for several fundamental reasons. *First*, Indalex expressly consented to and waived any conflict allegedly arising from Kirkland's representation of the Sun Capital Defendants in this matter. *Second*, plaintiff's claims in this matter are not "substantially related" to Kirkland's prior work for Indalex. *Third*, plaintiff does not and cannot show that Kirkland obtained any confidential information during its representation of Indalex that could materially affect these proceedings. *Fourth*, by waiting almost a year to file its motion, plaintiff

8

impliedly waived any alleged conflict. *Fifth*, disqualification of Kirkland would unfairly and severely prejudice Sun Capital and, at the same time, unfairly reward plaintiff.

## I.    INDALEX CONSENTED TO AND WAIVED ANY ALLEGED CONFLICT ARISING FROM KIRKLAND'S REPRESENTATION OF SUN CAPITAL.

There is no dispute that, under Model Rule 1.9, Indalex could waive the alleged conflict plaintiff now asserts. There is likewise no dispute that Indalex did just that when it executed its written retention agreement with Kirkland in February 2006. Plaintiff maintains that Indalex's conflict waiver was uninformed and challenges both the substance of the waiver and Michael Alger, the individual who signed it. This position has no merit.

### A.    Indalex Executed A Written Retention Agreement That Meets All Of The Requirements Of A Valid Waiver.

As set forth in detail above, the conflict waiver provision in Kirkland's retention agreement with Indalex made clear to Indalex that: (1) Kirkland had a close and continuing professional relationship with Sun Capital; (2) Indalex was waiving past, present, and *future* conflicts arising from Kirkland's representation of Sun Capital; (3) in the event of a conflict relating to Sun Capital, Kirkland could terminate its representation of Indalex and continue to represent Sun Capital, including in matters relating to Indalex; and (4) Indalex was free to seek independent legal advice regarding the waiver if it so desired. (*See* 12/9/10 Declaration of Michael E. Alger ("Alger Decl.") at ¶¶ 11-12, 23, 27-28)

In *Mervyn's LLC v. Lubert-Adler Group IV, LLC.,* Adv. Proc. No. 08-51402 (Bankr. D. Del. Oct. 7, 2009), Judge Gross held that an identical waiver between Sun Capital and another of its portfolio companies, Mervyn's, was (1) "clear"; (2) that it "[met] all of the requirements for a valid waiver"; and (3) that, by signing the waiver, Mervyn's had "waiv[ed] any conflicts that K&E would have with Mervyn's in its representation of Sun Capital." *Id.*, slip op. at 6, 12. Judge Gross's carefully considered determination in *Mervyn's* applies with equal force to the

9

identical Indalex conflict waiver at issue here. *See, e.g., Construcciones Haus Soceidad v. Kennedy Funding Inc.*, 07-cv-0392, 2008 WL 1882857, at *4 n.3 (D.N.J. April 24, 2008) ("the fact that the ***nearly identical contract language*** used by the same Defendants [in a different case] is at issue, makes [the earlier decision] highly persuasive to this Court's determination of the current motion.") (emphasis supplied); *Royale Luau Resort, LLC v. Kennedy Funding, Inc.*, 07-1342, 2008 WL 482327, at *3 (D.N.J. Feb. 19, 2008) ("unique applicability" of a prior decision "involv[ing] an almost identical contract with essentially ***the same terms*** in dispute") (emphasis supplied).

Unmoved by Judge Gross's holding in *Mervyn's*, as well as the case law confirming its precedential value, plaintiff argues that the Indalex conflict waiver (and, by implication, the identical Mervyn's waiver upheld by Judge Gross) is "boilerplate" and therefore failed adequately to inform Indalex of potential conflicts, including potential litigation. (Pl.'s Mem. in Support of Mot. to Disqualify ("Pl.'s Mem.") at 15)  But the conflict waiver language at issue here is not boilerplate at all. *Black's Law Dictionary* 175 (6th ed. 1990) ("boilerplate" is "standard language" used "without variation").  There is nothing "standard" or rote about the language of the Indalex conflict waiver, and Kirkland plainly does not and cannot use that language in engagement letters with all of its clients.  To the contrary, the conflict waiver language in the Indalex retention agreement is carefully crafted to address and resolve the potential conflicts that can arise when Kirkland is asked to represent both Sun Capital and/or one or more of its affiliates on the one hand and one of Sun Capital's portfolio companies on the other.  Indeed, in *Mervyn's*, Judge Gross rejected the plaintiff's similar argument that the identical Kirkland-Mervyn's waiver was "overly broad and vague." *In re Mervyn's*, slip op. at 13.  In doing so, he concluded that "[t]he waivers which include all past, present, and future

10

conflicts with Sun Capital, are limited to conflicts that K&E might have with Sun Capital as it relates to the specific work K&E did for Mervyn's. The scope of the waivers for this Adversary Proceeding is narrow." *Id.*

Even if the Kirkland-Indalex conflict waiver could be deemed "boilerplate" with respect to Kirkland's work for Sun Capital and its affiliated portfolio companies, that is hardly a reason to reject it. Although plaintiff uses the word "boilerplate" pejoratively, courts are not so quick to accept that label as an excuse for not enforcing provisions that use standard language. As the Seventh Circuit has explained, "the fact that language has been used before does not make it less binding when used again. Phrases become boilerplate when many parties find that the language serves their ends. That's a reason to enforce promises, not to disregard them." *Rissman v. Rissman*, 213 F.3d 381, 385 (7th Cir. 2000) (Easterbrook, J.) Indeed, "[c]ontractual language serves its functions only if enforced consistently. This is one of the advantages of boilerplate, which usually has a record of predictable interpretation and application." *Id.*

Boilerplate or not, Indalex's waiver leaves no doubt that Indalex understood that the Sun Capital-related conflicts that could arise in the future and become the subject of the waiver included matters related to the work Kirkland had done for Indalex:

> As you know, we have represented and represent Sun Capital Partners, Inc. and its affiliated investment funds and management companies (together, "Sun") on a variety of matters, including Sun's investment in you and anticipate that we will represent Sun in future matters. You are a portfolio company of Sun. This confirms that K&E LLP has informed you of its representation of Sun on a variety of matters, including Sun's investment in you, and that you consent to, and waive *any* conflict or other objection with respect to K&E LLP's representation of Sun, its affiliates or portfolio companies in connection with *any and all* (i) matters in which K&E LLP *currently* represents Sun, its affiliates or portfolio companies, including the Indalex matters, (ii) *past matters* in which K&E LLP represented you, Sun, Sun's affiliates or Sun's portfolio companies (or any combination thereof) and (iii) *future*

11

        ***matters*** in which K&E LLP might represent Sun (***whether or not
such matter is related to the Indalex Matters***).

(Gessner Decl., Ex. B at 4 (emphasis supplied).[2]

       Moreover, Indalex was plainly aware that, by agreeing to this conflict waiver, Kirkland

could appear in a subsequent matter adverse to Indalex. Indeed, the conflict waiver section of

the retention agreement begins by warning Indalex that its interest could diverge from the

interests of Kirkland's other clients and that, as a result, "the possibility exists that one of our

clients ***may take positions adverse to you***."[3] (*Id.* at 3) (emphasis supplied). In addition, by

reminding Indalex that it is "a portfolio company of Sun," that Kirkland had a close and ongoing

relationship with Sun Capital, and that Kirkland expected to continue representing Sun Capital in

the future, the waiver provision made clear that Indalex and Sun Capital could have divergent

interests and that a conflict could arise as a result. (*Id.* at 4)[4]

       Plaintiff essentially ignores all of this language. He also argues that Judge Gross's

decision in *Mervyn's* upholding the clarity, sufficiency, and validity of the waiver should not

apply here, but plaintiff's distinctions lack merit and miss the point. Plaintiff asserts that

---

[2]    Plaintiff complains that "the waiver here at issue is not limited to matters unrelated to K&E's work for Indalex", (Pl.'s Mem. at 18), but that does not render it invalid. While it is true that narrow waivers are "particularly" likely to be upheld, *see* Comment [22] to Rule 1.7, there is no rule against waivers of the type that Indalex granted to Kirkland here. Indeed, the plain language of Rule 1.9 contemplates such waivers. In Formal Opinion 2006-1, for example, the New York Bar Association's Committee on Professional and Judicial Ethics ruled that "[a]t least for a sophisticated client, blanket advance waivers and advance waivers that include substantially related matters (with adequate protection for client confidences and secrets) also are ethically permitted." New York Bar Association's Committee on Professional and Judicial Ethics, Formal Op. 2006-1. "[A] sophisticated client is one that readily appreciates the implications of conflicts and waivers. This would include, but not be limited to, clients that regularly engage outside counsel for legal services, or that have access to independent or inside counsel for advice on conflicts." *Id.*, note 1. Indalex fell squarely within this definition of "sophisticated client."

[3]    While this introductory sentence references potential conflicts with other Kirkland clients, the agreement encompasses ***only*** those conflicts arising out of Kirkland's representation of Sun Capital. (Gessner Decl., Ex. B at 3)

[4]    Although the conflict waiver did not specifically contemplate litigation, that does not render it invalid, either. As Judge Gross concluded in Mervyn's, "[t]he Committee argues that Mervyn's did not contemplate litigation when it signed the waiver. Neither did K&E, and thus K&E could not inform Mervyn's of what it didn't know would happen." *In re Mervyn's*, slip op. at 13.

*Mervyn's* was different because there was no substantial relationship between Kirkland's representation of Sun Capital in that adversary proceeding and its prior representation of Mervyn's; the waivers in that case were executed by Mervyn's general counsel; and there was no evidence (only "mere speculation") that Kirkland had obtained confidential information from Mervyn's that its owner, Sun Capital, had not. (*See* Pl.'s Mem. at 20-21) For the reasons stated below, none of these purported distinctions between this case and *Mervyn's* is valid or meaningful. But even if they were, they have nothing to do with the clarity, sufficiency, and validity of the language of the Indalex conflict waiver itself. Accordingly, they do not support plaintiff's "boilerplate" argument, and they do not support plaintiff's attempt to avoid Judge Gross's decision upholding the sufficiency and validity of the conflict waiver provision.

The cases upon which plaintiff relies do not support his attack on the substance of Indalex's conflict waiver, either. Plaintiff cites several cases where allegedly "open-ended prospective" waivers were found to be inadequate. (Pl.'s Mem. at 16-17) But none of this authority involves waivers that looked anything at all like the Kirkland-Indalex conflict waiver and, tellingly, plaintiff does not even attempt to compare them. For example, plaintiff cites *Ulico* for the proposition that courts have "declined to enforce waivers that did not adequately disclose the nature of any anticipated conflicts." (*Id.* at 16 (*citing Ulico Cas. Co. v. Wilson, Elser, Maskowitz, Edelman & Dicker*, 843 N.Y.S.2d 749 (N.Y. App. Div. 2007)) But in *Ulico*, where a client sued its former attorneys for working with a competitor to "convert" business, the waiver merely stated generally that the attorney is not "prevented or barred from taking other employment of a similar or other legal character . . . ." *Ulico Cas. Co.*, 843 N.Y.S.2d at 753-54. Similarly, in *Concat LP v. Unilever PLC*, the waiver made no mention of the specific client with whom a potential conflict could arise. 350 F. Supp. 2d 796, 801 (N.D. Ca. 2004) ("It is possible

13

that *some* of our present or future clients will have disputes or other dealings with you . . . .")
(emphasis supplied); *see also Celgene Corp. v. KV Pharmaceutical Co.*, No. 07-4819, 2008 WL
29347415, at *1 (D.N.J. July 29, 2008) ("From time to time we may be asked to represent
*someone* whose interests may differ from the interests of the Company.") (emphasis supplied);
*Schwartz v. Industrial Valley Ins. Co.*, No. 96-CV-5677, 1997 WL 330366, at *6 (E.D. Pa. June
5, 1997) (waiver inadequate because it did not expressly include "future dispute[s]"). Plainly, all
of these waivers were far more general and "open-ended" than the Kirkland-Indalex waiver.

Just as plainly, in the cases cited by plaintiff, there was an actual risk that confidential
materials might be disclosed to an adversary. *See, e.g., Westinghouse Elec. Corp. v. Kerr-
McGee*, 580 F.2d 1311, 1320 (7th Cir. 1978) ("the transmission by oil companies of confidential
information . . . has given rise to justifiable fears that their disclosures will return to haunt them
in the present litigation") (internal citations omitted); *Westinghouse Elec. Corp. v. Gulf Oil
Corp.*, 588 F.2d 221, 229 (7th Cir. 1978) (disqualification premised on "the potential for abuse of
confidential information"). Therefore, central to each holding is the notion that more detailed
waiver language would have served a purpose, *i.e.*, protecting genuinely confidential information
from inappropriate use and disclosure. *See, e.g., Westinghouse Elec. Corp. v. Kerr-McGee*, 580
F.2d at 1321. As explained in more detail in Part III below, that kind of confidentiality concern
is simply not present here. Because Sun Capital's affiliates were the owners of Indalex, Sun
Capital representatives served on various Indalex boards of directors, and a Sun Capital affiliate
provided ongoing management services to Indalex pursuant to a management services
agreement, Indalex had no expectation of confidentiality vis-à-vis Sun Capital. Put another way,
there is no real risk in this case that Kirkland obtained from Indalex confidential information that

14

Sun Capital did not also receive because of its affiliates' ownership and business relationship with Indalex. Because of this, plaintiff's case law is inapposite.

## B.    Indalex Knowingly And Voluntarily Agreed To The Conflict Waiver.

Just as there is no basis for challenging the substance of the Indalex conflict waiver, there is also no valid basis for second-guessing Indalex's decision to waive conflicts arising from Kirkland's representation of Sun Capital.   Unlike clients of limited means, resources, and comprehension, Indalex, when it executed the retention agreement, was a $425 million enterprise with operations in several countries, and, as of February 2, 2006, over two thousand employees. (Alger Decl. at ¶ 17)  Indalex was also a sophisticated consumer of legal services.  In 2008, for example, Indalex used 13 law firms other than Kirkland and paid them a total of $1.12 million dollars.  (Indalex paid Kirkland $410,000 in 2008.)  (*See* Pl.'s Mem., Ex. 11)  In 2009, Indalex used nine firms other than Kirkland and paid them a total of $592,000 in fees.  (Indalex paid Kirkland $184,000 in 2009.)  (*Id.* at Ex. 12)  Plainly, Indalex knew how to get legal advice when it needed it.

Just as Indalex was a sophisticated business, Mike Alger, the executive who signed the retention agreement on behalf of Indalex, was an experienced and sophisticated businessman. (Alger Decl. at ¶¶ 1-2, 4-5)  In February 2006, Mr. Alger was Indalex's CFO and had been in that position since 2000.[5]  (*Id.* at ¶ 2)  Before joining Indalex, Alger was Vice President of Finance for Favorite Brands, a large multi-brand confection company and, before that, he was the CFO for Jel Sert and Olds Products, two large food companies.  (*Id.* at ¶¶ 4-5)  As of February 2006, Mr. Alger, a CPA, had more than 24 years of experience in senior finance and

---

[5]    Since 2007, Mr. Alger has worked for a Sun Capital affiliate.  (*See* Alger Decl. at ¶2)  But, on February 2, 2006, when he signed the retention agreement on behalf of Indalex he had no prior association with Sun Capital or Kirkland.  (*Id.* at ¶¶ 9, 11)  Indeed, up to February 2, 2006, his experience with Sun Capital (and Kirkland) had been that of an arm's-length negotiator.  (*Id.*)

operations management. (*Id.* at ¶ 1) He was also involved in Indalex's selection and retention of law firms, and he often interacted with Indalex's other lawyers, including various law firms involved in Sun Capital's 2006 acquisition of Indalex. (*See id.* at ¶¶ 3, 10, 14)

Against this background, Indalex, through Mr. Alger, was perfectly capable of signing the conflict waiver agreement that plaintiff now seeks to invalidate. Still, plaintiff argues that there is "no indication" or "reason to believe" that Alger knew how to retain a law firm, "no evidence" that Alger had an in-house lawyer available, and "no reason to believe" that Alger was free to consult with independent counsel. (Pl.'s Mem. at 19) Plaintiff also suggests that Mr. Alger's execution of Indalex's conflict waiver was "involuntary." (*Id.*) As explained above, plaintiff's own evidence, *i.e.*, the exhibits attached to the Plaintiff's Memorandum in Support of Motion to Disqualify, which list all of Indalex's outside law firms over a period of three years, belies each of these claims. (*See* Pl.'s Mem., Exs. 11-12) Plainly, Indalex and Alger knew how to hire a law firm when they felt the need to do so. (*See* Alger Decl. at ¶¶ 33-34) Just as plainly, Indalex and Alger knew how to hire a firm *other than Kirkland* when they felt that it was appropriate to do so.

Plaintiff's arguments appear to rest largely on the fact that Mr. Alger is not a lawyer, but that hardly renders his consent void or uninformed. Indeed, plaintiff does not—and cannot—cite a single case holding that *an attorney* is required to execute (or review) a waiver in order for it to be considered informed and enforceable. To the contrary, there are numerous cases, where, as here, a sophisticated businessman or executive like Mr. Alger, knowingly waived future conflicts.[6] *See, e.g., United States v. Hatfield*, No. 06-CR-0550, 2009 WL 3806300, at *13

---

[6]    As any experienced executive knows (and certainly one with as much experience as Mr. Alger), the fact that the waiver agreement was in a writing that required a counter-signature underscored its importance and seriousness. *See* Rule 1.7 cmt. 20 (explaining that one reason for requiring written consent is "to impress upon clients the seriousness of the decision the client is being asked to make . . . .") Moreover, in agreeing to the waiver

(E.D.N.Y. Nov. 13, 2009) ("a sophisticated businessman" understands that he can, by contract, waive rights); *MJK Family LLC v. Corp. Eagle Mgmt. Servs., Inc.,* 676 F. Supp. 2d 584, 599 (E.D. Mich. 2009) (finding informed consent because shareholders who signed the consent were sophisticated business persons who should have known that "with any substantial investment in an LLC, there is a potential for conflict between the Management and the shareholders."); *Fed. Home Loan Mortgage Corp. v. La Conchita Ranch Co.,* 68 Cal. App. 4th 856, 637-38 (Cal. Ct. App. 1998) (finding informed consent when corporation's board members were "highly sophisticated and fully capable of determining where [the corporation's] best interests lie.").

If there were any doubt about the informed and voluntary nature of Indalex's conflict waiver, however, it is dispelled by the attached declaration of Mr. Alger himself. There, Alger swears under penalty of perjury that:

- As Indalex's CFO, he was involved in Indalex's selection and retention of law firms, and that Indalex used a number of outside law firms both before and after it was acquired by Sun Capital. (Alger Decl. at ¶¶ 3, 18)

- During the due diligence process leading up to the acquisition, Mr. Alger interacted regularly with various law firms, and with Kirkland, which was then representing Sun Capital. (*Id.* at 13-14) During this period, Mr. Alger learned that Sun Capital and Kirkland had a long and close professional relationship, and that Kirkland represented a number of Sun Capital's portfolio companies. (*Id.* at 11-12)

- By the time the acquisition closed on February 2, 2006, Mr. Alger was aware of Kirkland's excellent reputation and wanted to retain the firm to perform work for Indalex. (*Id.* at ¶¶ 11, 19-20) His decision was approved by Mr. Stubbs, Indalex's CEO.[7] (*Id.* at 30)

---

request, Indalex and Mr. Alger obviously had the ability to seek advice from other counsel if they deemed it necessary. The retention agreement made this point by cautioning Mr. Alger that Kirkland could not advise Indalex with respect to the waiver and reminding him that he could confer with other counsel before deciding whether to agree to it: "We are not advising you with respect to this Agreement because we would have a conflict of interest in doing so. If you wish [to] receive [such] advice, you should consult [with] independent counsel of your choice." (Gessner Decl., Ex. B at 5)

[7]    It was not necessary for Indalex's board of directors to approve the hiring of K&E, and it was not customary for Indalex's board of directors to approve the hiring of outside counsel. (Alger Decl. at ¶ 31)

- Before retaining Kirkland, Mr. Alger received a copy of Kirkland's proposed retention agreement, which he read and understood. (*Id.* at 21-22)

- In many respects, the retention agreement simply confirmed what Mr. Alger already knew—for example, that Kirkland had represented Sun Capital on a variety of matters, including its investment in Indalex; that Kirkland was continuing to represent Sun Capital in a variety of matters, including matters relating to Indalex; and that Kirkland would likely continue to represent Sun Capital in the future, including on matters relating to Indalex. (*Id.* at 23)

- Mr. Alger knew and understood that conflicts could arise as a result of Kirkland's representation of both Sun Capital and Indalex. (*Id.* at 28)   He knew and understood that Kirkland was asking for a waiver of past, present and ***future*** conflicts arising from its representation of Sun Capital. (*Id.* at 29)   Mr. Alger was aware that if a conflict arose relating to Sun Capital, Kirkland could terminate its representation of Indalex and continue to represent Sun Capital, including in matters relating to Indalex, even future litigation. (*Id.*)

- Mr. Alger knew that he could consult independent counsel with questions or, if necessary, he could ask Kirkland for clarification of any of the provisions of the retention agreement, including the conflict waiver provisions, and that he could negotiate changes if necessary. (*Id.* at ¶¶ 24-25, 32)

- After reading the retention agreement, Mr. Alger did not have any questions. (*Id.* at 26)   Nor did he believe it necessary to consult with an independent lawyer. (*Id.*)   So, Mr. Alger signed the retention agreement.[8]

Thus, by signing the retention agreement and the waiver contained therein, Mr. Alger, on behalf of Indalex, knowingly and intentionally waived any conflict or other objection with respect to K&E's representation of Sun Capital in connection with any and all future matters in which Sun Capital may become adverse to Indalex, and including litigation matters.   Mr. Alger's declaration thus establishes that Indalex's conflict waiver was informed and voluntary.   There is no evidence to the contrary, and plaintiff's unsupported suggestions that Mr. Alger and Indalex did not know what they were doing are entirely unsupported and utterly baseless.

---

[8]   At the time of the acquisition and thereafter, Indalex was not under any obligation to use Kirkland. (Alger Decl. at 32) To the contrary, Indalex could and did hire other law firms when it believed it was appropriate to do so. (*Id.* at ¶¶ 33-34) For example, Indalex did not use Kirkland when Indalex sold its interest in AAG—the major transaction that generated the funds that were used, among other things, to pay the May 31, 2007 dividend about which plaintiff complains in this action. (*Id.* at 34) Rather, Indalex hired and used Freshfields for that significant matter, because it felt that Freshfields was better equipped to do the work. (*Id.*)

18

II.  **PLAINTIFF'S CLAIMS IN THIS ADVERSARY PROCEEDING ARE NOT "SUBSTANTIALLY RELATED" TO KIRKLAND'S PREPETITION WORK FOR INDALEX.**

The premise of plaintiff's motion to disqualify Kirkland is that his claims in this action are "substantially related" to prepetition legal work that Kirkland performed for Indalex. (Pl.'s Mem. at 11-13)  Thus, plaintiff argues generally that "K&E was Indalex's counsel from before the Honeywell transaction on February 2, 2006 to shortly before the bankruptcy filings more than three years later"; that Kirkland earned substantial fees for its work; and that Kirkland's fees were higher than the fees paid to Indalex's other law firms. (*Id.* at 11 & n.8)  In the same vein, plaintiff asserts generally in the introduction to his brief that "[t]he transactions set forth in the complaint were all undertaken while Kirkland & Ellis ("K&E") was Indalex's counsel," and that Kirkland performed a litany of no less than 11 "tasks" for Indalex during its three-year professional relationship with the company. (*Id.* at 2)

Much of plaintiff's laundry list of "tasks" that Kirkland performed for Indalex is misleading, beside the point, or both.  For example, plaintiff trumpets that Kirkland's tasks included "documenting the entire sale transaction by which Holding acquired Indalex Inc. and Indalex Limited from Honeywell." (*Id.*)  But this was work that Kirkland did for **Sun Capital** almost entirely in advance of the acquisition, not for Indalex after the closing. (Gessner Decl. at ¶ 2-3)  Plaintiff also emphasizes that Kirkland's tasks included "preparing and/or reviewing SEC filings and various financial documents" and "drafting, reviewing and/or revising other corporate documentation including articles of incorporation and Board of Directors documents." (Pl.'s Mem. at 2)  But, like Kirkland's work for Sun Capital on the acquisition itself, this work had absolutely nothing to do with the transactions at issue in plaintiff's complaint.

19

Although plaintiff's complaint is lengthy and prolix, its allegations and causes of action focus mainly on three principal claims. First, plaintiff claims that a May 31, 2007 dividend of approximately $76.6 million rendered Indalex insolvent.[9] (*See id.* at 1-2) Second, plaintiff alleges that, both before and after it was insolvent, Indalex paid a Sun Capital affiliate management and transaction fees that "did not correlate to any services actually performed" and that related to "transactions which were not in Indalex's best interest." (*Id.*) Third, plaintiff alleges that "a purported security interest Sun [Capital] attempted to secure in 2008 should be invalidated since it was not properly perfected and it relates to equity infusions rather than loans." (*Id.*)

To be sure, plaintiff also argues Kirkland's work for Indalex "encompassed" these matters, (*id.* at 12), but even as to this work, plaintiff's "task list" is incomplete and misleading. With respect to the management and transaction fees, for example, plaintiff suggests that Kirkland "formulat[ed], review[ed] and/or revis[ed]" for Indalex the Management Services Agreement pursuant to which a Sun Capital affiliate received those fees. (*Id.* at 3) But, that is not accurate. The Management Services Agreement was negotiated and drafted prior to the closing and executed at the closing. (Gessner Decl. at ¶ 10) (Indeed, Kirkland only spent 2.25 hours rendering advice to Sun Capital regarding that agreement after the closing.) (*Id.*) At bottom, Kirkland's work on the Management Services Agreement was work performed for **Sun Capital**, not Indalex. (*Id.*)

---

[9]    Although the merit of this claim is a question for another day, this claim is baseless, and plaintiff fails to tell the whole story. The evidence will show that a principal driver of Sun Capital's investment in Indalex was its belief that Indalex's 25.1% interest in Asia Aluminum Group ("AAG") was significantly undervalued. Moreover, Sun Capital's intent to sell that interest following its acquisition of Indalex was hardly a secret. To the contrary, the indenture governing the notes that were issued as part of the acquisition specifically addressed how the proceeds of such a sale could be used, and the dividend about which plaintiff now complains was consistent with that indenture. In short, the evidence will show plaintiff's claim that Sun Capital "looted" Indalex and somehow fooled or harmed creditors by causing Indalex to pay this dividend has absolutely no basis in fact.

Plaintiff also asserts that Kirkland "formulat[ed], review[ed] and/or revis[ed]" the "documents relating to equity infusions by which Sun [Capital] claims a priority security interest." (Pl.'s Mem. at 3)  However, the actual drafting and documentation of Sun Capital's 2008 loans was handled by the law firm of Cravath, Swaine & Moore, not by Kirkland. (Gessner Decl. at ¶ 20)  Moreover, although Kirkland assisted Indalex in the review and execution of the documents prepared by Cravath, the vast majority of Kirkland's work was spent advising Sun Capital (and not Indalex) regarding:  (i) intercreditor issues between JP Morgan and Sun Capital in connection with Sun Capital's infusion of capital into the existing credit facility; and (ii) the formation of a new Sun Capital-related entity to act as the lender in the transaction.  (*Id.*)  At bottom, Kirkland did not and could not provide any advice to Indalex on its financial condition at the time of the loans.  Nor did Kirkland provide any advice to Indalex on the question whether the loans might be recharacterized as equity contributions.

Plaintiff further asserts that Kirkland "formulat[ed], review[ed] and/or revis[ed] . . . SEC filings which contain representations that, as of April 2, 2007, Indalex did not intend to pay dividends," and "earnings releases which contain representations as to how Indalex intended to utilize[ ] the AAG sale proceeds." (Pl.'s Mem. at 3)  This, too, is beside the point.  That Kirkland reviewed Indalex filings and releases containing forward-looking statements regarding dividends hardly means that Kirkland "represented" Indalex with respect to the propriety of a subsequent dividend, let alone whether such a dividend would render Indalex insolvent. Kirkland did no such thing. (Gessner Decl. at ¶ 11, 14)  Rather, Kirkland reviewed Indalex's SEC filings and releases to ensure their technical compliance with the SEC rules and regulations applicable to such disclosures.  (*Id.*)

21

Plaintiff also asserts that Kirkland "formulat[ed], review[ed] and/or revis[ed] FTI's solvency 'opinion'" supporting the dividend, "pro forma financial statements" that allegedly were given to FTI, and the unanimous consent pursuant to which Indalex's board approved payment of the May 31, 2007 dividend. (Pl.'s Mem. at 3)  These arguments also miss the point. Three Kirkland attorneys spent a total of 17.75 hours reviewing the FTI report to make sure it adequately covered the technical requirements of the relevant provisions of the Delaware Code; they did not and could not advise Indalex on the financial propriety of the dividend, or on whether the payment of the dividend would render Indalex insolvent.  (Gessner Decl. at ¶ 17) That was not a legal issue.  Rather, it was a financial issue, for the board to decide with the assistance of its financial advisor, FTI.  (*Id.*)

Similarly, three Kirkland attorneys spent 7.5 hours reviewing Indalex's pro forma financial statements, tender offer documents, and debt covenant obligations to ensure compliance with, among other things, relevant SEC disclosure requirements.  (Gessner Decl. at ¶ 16) Neither of these three lawyers provided Indalex with any advice or comments on the propriety of a dividend of the impact of such a dividend on the solvency of the company.  (*Id.*)  Finally, three Kirkland attorneys spent approximately 10 hours reviewing the Indalex board resolutions relating to the May/June 2007 dividend.  (Gessner Decl. at ¶ 18)  The purpose of this work was to ensure that Indalex's resolutions met the technical requirements required under relevant Delaware law and the requirements of Indalex's various credit agreements.  (*Id.*)  At no time did the Kirkland attorneys who did this work provide any opinion or advice with respect to the solvency of Indalex or whether the proposed dividend would constitute an avoidable transfer. (*Id.*)[10]

---

[10]    This is not to imply that Kirkland did no work at all relating to the dividend.  Although Plaintiff does not appear to reference it in his brief, several Kirkland attorneys performed limited legal work relating to Indalex's

22

For all these reasons, plaintiff has failed completely to carry his burden of demonstrating the premise of his motion—a violation of Model Rule 1.9,[11] let alone a violation that justifies disqualifying Kirkland from representing the Sun Capital Defendants in this proceeding. By its plain terms, Model Rule 1.9 requires more than a mere relationship; it requires a *substantial relationship* between the current and prior matters. Model Rules of Prof'l Conduct R. 1.9. Further, the rule does not require the abandonment of common sense. As the comments to the rule make clear, "[t]he scope of a 'matter' for purposes of this Rule depends on the facts of a particular situation or transaction," and "[t]he lawyer's involvement in a matter can also be a question of degree." *Id.* at R. 1.9 cmt. 2. Here, while it is true that Kirkland performed some work that was related to the dividend and loan transactions at issue in this case, none of that work was "substantially related" to those transactions in a way that will have a material impact on this litigation. At bottom, plaintiff's claims against the Sun Capital Defendants in this action will rise or fall largely on plaintiff's ability to prove that Indalex was rendered insolvent by the May 2007 dividend. Kirkland never touched that issue, and it certainly has not "switched sides" on it. At bottom, Kirkland's prepetition legal work for Indalex is irrelevant to the core financial issue in this case.

---

decision to declare and pay the May/June 2007 dividend. (Gessner Decl. at ¶ 13) For example, Kirkland's Ted Frankel, who worked on the acquisition, spent 6.5 hours providing Indalex with his institutional knowledge of Indalex's obligations under the various acquisition agreements and advice on the basic requirements for dividends under Delaware law. (*Id.*) However, at no time did he or any other Kirkland attorneys give Indalex advice on the impact of a dividend on the solvency of Indalex.

[11]    Plaintiff concedes that he bears the burden of demonstrating the existence of a "substantial relationship" within the meaning of Model Rule 1.9. (Pl.'s Mem. at 11 n.7)

III.    **PLAINTIFF DOES NOT AND CANNOT SHOW THAT KIRKLAND OBTAINED ANY CONFIDENTIAL INFORMATION FROM INDALEX THAT WOULD MATERIALLY AFFECT THESE PROCEEDINGS.**

Plaintiff does not offer a shred of evidence to support his claims that there is "little doubt that K&E obtained confidential information in relation to" the matters it handled for Indalex, and that "K&E's prior representation of Indalex on these issues gives K&E a patently unfair advantage in defending the Sun [Capital] Defendants. (Pl.'s Mem. at 12) Absent such evidence, "[t]he Court should not and will not 'hypothesize' or 'imagine' the possibility of the disclosure of confidential information." *In re Mervyns*, slip op. at 11-12 (*citing Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F. Supp. 1281, 1284 (D. Del. 1987) ("[T]he court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which would be relevant to the present suit.")).

Moreover, plaintiff's unsupported concerns regarding confidentiality are utterly implausible given Sun Capital's relationship with Indalex.  From the closing of the Indalex acquisition, Sun Capital affiliates owned over 90% of the outstanding common stock of Indalex Holdings Finance, Inc. (the entity overseeing Indalex's operations) and held a majority of the seats on that company's board of directors.[12] (*See* Gessner Decl. at ¶ 4)  A Sun Capital affiliate also provided advisory and consulting services to Indalex pursuant to a Management Services Agreement.  (*Id.* at ¶ 5)  As a result of these roles and relationships, Sun Capital affiliates regularly received information concerning all aspects of Indalex's business, including

---

[12]    Under Delaware law, Sun Capital's representatives on Indalex's various boards of directors had the right to expect—and Indalex officers and management a duty to provide them—confidential information.  8 Del. C. § 220 ("[a]ny director . . . shall have the right to examine the corporation's . . . books and records for a purpose reasonably related to the director's position as a director.").  Courts have consistently affirmed that this right includes access to privileged information. *See Carnegie Hill Fin., Inc. v. Krieger*, 99-CV-2592, 2000 WL 10446, at *2 (E.D. Pa. Jan. 5, 2000) (taking as a given that directors were entitled to legally privileged information when they served as board members); *Kirby v. Kirby*, 1987 WL 14862, at *7 (Del. Ch. July 29, 1987)

24

confidential information. (*Id.*) Indeed, by law, Indalex was *required* to allow Sun Capital access to all of the information that was material to Indalex's business affairs. 8 Del. C. § 220. Plaintiff's allegation that Sun Capital "controlled" Indalex only underscores this point. (*See* Compl. at ¶106) Thus, what Judge Gross noted in *Mervyn's* applies with equal force in this case: Plaintiff's motion to disqualify "ignores Sun Capital's management role" after Indalex was acquired and the fact that Sun Capital was entitled to "direct access to confidential information, *without K&E.*" *In re Mervyns*, slip op. at 11 (emphasis supplied); *see also Bagdan v. Beck*, 140 F.R.D. 660, 670 (D.N.J. 1991) (no disqualification where the challenged firm represented directors with access to the confidential information).[13]

All of this explains why plaintiff is hard-pressed to identify *any* confidential information material to this litigation that Sun Capital, through its affiliates, would not already have received, and was entitled to receive, in its capacity as owner, board member, officer, and advisor. Nor can plaintiff show that Indalex had any reasonable expectation that any confidential information would have been kept from Indalex's owner-investors, board members, officers, and advisors— *i.e.*, Sun Capital. Indeed, if such information existed and were truly important and closely connected to the transactions at issue in this action, by definition it should have and would have been communicated to Sun Capital and the other investors in Indalex, who would have required such information in order to discharge their various responsibilities with respect to their Indalex investment.

---

[13]    Aware that the above point guts his motion to disqualify, plaintiff cites *Brennan's Inc. v. Brennan's Restaurants, Inc*, 590 F.2d 168, 172 (5th Cir. 1979), a non-controlling case from 1979, for the proposition that confidential information gathered by an attorney "is sheltered from use by the attorney . . . without regard to whether someone else may be privy to it." (Pl.'s Mem. at 17 n.11) *Brennan's* is distinguishable for two reasons. First, unlike Kirkland's representation of Indalex, the disqualified attorney in *Brennan's* did not secure a waiver from his clients allowing him to represent one group in the event that a conflict arose. Second, the clients in *Brennan's* were not required to share all of their confidences with one another, as Indalex was with its majority shareholders, Sun Capital-affiliated board members, and advisors. Thus, in *Brennan's*, the risk that confidential information could be disclosed by the attorney was genuine.

25

In sum, plaintiff does not, because he cannot, credibly claim that Kirkland obtained any information that was not already known to Indalex's investor-owners (and certain of their affiliates) or that its receipt of confidential information is a valid basis for disqualification. *See, e.g.,* Model Rules of Prof'l Conduct R. 1.9 cmt. 3 ("Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying); *see also Bagdan*, 140 F.R.D. at 670. Plaintiff does not even try, because this case simply does not implicate the client confidentiality policies upon which Model Rule 1.9 rests.

## IV.    PLAINTIFF HAS IMPLIEDLY WAIVED ANY ALLEGED CONFLICT OF INTEREST.

"As a general matter, a client may expressly *or impliedly* waive his objection and consent to an adverse representation." *Elonex I.P. Holdings, Ltd.*, 142 F. Supp. 2d at 582 (emphasis supplied). And, where, as here, a party has failed to assert a conflict in a timely manner, courts will not hesitate to find an implied waiver. *See, e.g., In re Kaiser Group Int'l, Inc.*, 272 B.R. 846 (Bankr. D. Del. 2001) (five month delay in filing motion was unreasonable); *In re Muma Servs., Inc.*, 286 B.R. 583 (Bankr. D. Del. 2002) (less than one-year delay in filing motion constituted implied waiver). On this record, there can be no question that plaintiff has impliedly waived any objection to Kirkland's role in this adversary proceeding.

The debtors have known of Kirkland's role as Sun Capital's counsel since Indalex first filed for bankruptcy protection in March 2009. Indeed, Kirkland was included on the mandatory service list for *all* pleadings, as Sun Capital's counsel, from the beginning. (*See e.g.,* 12/9/10 Declaration of James A. Stempel ("Stempel Decl.") at ¶ 5) This, in and of itself, establishes that the debtors knew of Kirkland's role. *In re Muma Servs., Inc.*, 286 B.R. at 88 n.5 (client had constructive knowledge of law firm representation disclosed in bankruptcy filing).

More critically, shortly after the bankruptcy cases commenced, the Committee, in concert with debtors' counsel, engaged in direct discussions with Kirkland over a period of many months about potential claims against Sun Capital. (Stempel Decl., at ¶¶ 6-13, Ex. B) As part of these discussions, Kirkland negotiated and executed several stipulations extending the time for the Committee and the debtors to investigate potential claims against Sun Capital. (Stempel Decl., at ¶¶ 12-13) While these discussions were under way, the Committee actually considered a possible motion to disqualify Kirkland. (*See* Stempel Decl., ¶ 14, Ex. D, at 29) As the billing records from the Committee demonstrate, in June 2009, seventeen months before plaintiff filed his instant motion, the Committee's lawyers "[r]esearched pleadings filed in Mervyn's adversary proceeding relating to motion to disqualify counsel to Sun Capital . . . ." (*See* Stempel Decl., Ex. D, at 29) Having done so, the Committee declined to bring such a motion. Instead, it continued to discuss potential claims against Sun Capital with Kirkland acting as Sun Capital's representative.

These discussions continued into the late summer of 2009. That August, after the Committee was granted derivative standing to pursue claims on behalf of the debtors, it provided Kirkland with a draft complaint against Sun Capital. (*See* Stempel Decl., ¶¶ 15-16, Ex. G) Putting it mildly, this draft is remarkably similar to plaintiff's complaint on a variety of fronts, including the parties named, the facts pled, and its theories of recovery. (*Compare* Compl. Counts I, II, *with* Stempel Decl., Ex. G at pp. 29-31, Counts I and II (both stating claims for fraudulent transfer relating to dividends and management fees under 11 U.S.C. §§ 544, 548)) Indeed, in most aspects, plaintiff's complaint simply parrots the draft that Kirkland received from the Committee well over a year ago. (*Compare, e.g.,* Stempel Decl., Ex. G, at ¶ 72 ("The capital structure imposed on Indalex as a result of the Indalex Acquisition left Indalex in a

27

precarious financial position . . . ."), *with* Compl. ¶ 4 ("As a result of the Acquisition, the consolidated operations of Indalex Inc. and Indalex Limited . . . became instantly financially precarious.")) Thus, months and months ago, the Committee and the debtors were in discussions with Kirkland ***about the very substance of this proceeding***. And, just as critically, Kirkland began marshaling facts and evidence in preparation of Sun Capital's defense against the same allegations of this case. (*See* Stempel Decl. at ¶¶ 16-20) Not once, from the filing of bankruptcy through these discussions, did anyone raise an issue about a potential conflict of interest on Kirkland's part, even though the Committee considered filing a motion to disqualify.

Plaintiff cannot plead ignorance of these dealings with Kirkland. (*See, e.g.,* Pl.'s Mem. at 22) In fact, as a matter of law, he has constructive knowledge of them. *In re Mervyn's Holdings*, slip op. at 13 (knowledge of K&E's work for debtors clearly imputable to the Creditors' Committee). Moreover, as evidenced by the fee application recently filed by the Dilworth Paxson firm, plaintiff (and his lawyers) continued negotiating with Kirkland, as Sun Capital's counsel, from almost the moment they were appointed. (*See* Docket No. 1079, *First Interim Application of Dilworth Paxson LLP For Compensation For Services Rendered And Reimbursement Of Expenses As Counsel To George L. Miller, Chapter 7 Trustee, For The Period From November 3, 2009 Through September 30, 2010*) That application also demonstrates that, as early as December 2009, plaintiff's counsel was reviewing emails from Kirkland (acting on behalf of Sun Capital) on host of items, including "carveout" and "liquidation issues," "professional fees," and "allocation" disputes. (*Id.* at Ex. A, pps. 14, 15, 16, 18, 19, 21)

Plaintiff's interactions with Kirkland continued into this year. Indeed, in January 2010, within three weeks of Kirkland's first filing in the Chapter 7 proceedings, counsel for plaintiff,

28

Ms. McIlvan, contacted Kirkland to request immediate access to books and records of Indalex. (*See* Stempel Decl., ¶29, Ex. I (1/28/10 Ltr. from McIlvain to J. Rowe))  At this point again, neither plaintiff, nor his counsel, raised the specter of disqualification with Kirkland.  Quite the opposite, for months, they engaged in correspondence and communications with Kirkland about discovery and, more critically, settlement negotiations *about resolution of this case*.  (*See* Stempel Decl., Ex. J (4/28/10 E-mail from P. Hughes to J. Stempel))  It was only after plaintiff's settlement discussions with Kirkland foundered, and he filed this adversary proceeding, that he placed Kirkland on notice of his potential disqualification argument.  (*See* Stempel Decl., ¶ 36, Ex. K (8/16/10 E-mail from M. McIlvain to M. Duffy))

Plaintiff's delay is inexcusable and exactly the type of gamesmanship that courts disallow.  Indeed, in *Mervyn's*, Judge Gross chastised the party moving for disqualification for claiming that it did not learn of Kirkland's representation of Sun Capital until "some eight months after Debtors filed the bankruptcy case."  *In re Mervyn's*, slip op. at 6; *see also In re Kaiser Group*, 272 B.R. 846 (five month delay in filing motion was unreasonable).  According to Judge Gross, based upon Kirkland's filings and other disclosures, the movant "could and should have known early on that K&E represented Sun Capital."  *In re Mervyn's,* slip op at 6.  Accordingly, a lapse of less than a year between the filing of bankruptcy and disqualification papers was deemed "especially egregious."  *Id.* at 14.  Plaintiff's delay is even more troubling.  Indeed, unlike *Mervyn's*, Kirkland was involved, for at least a year, in discussions with the debtors and the Creditors' Committee *about the very subject of this lawsuit*.  (Stempel Decl. at ¶¶ 6-13)  Moreover, a motion to disqualify Kirkland was considered—and abandoned—by the Committee seventeen months before plaintiff reversed course and filed the present motion—after his use for Kirkland as a discovery and settlement intermediary had been exhausted.

Plaintiff cannot justify this tardiness. In fact, plaintiff's conscious delay in seeking the disqualification of Kirkland strongly suggests that his motion is part of a "litigation strategy" to "gain an advantage over Sun Capital by depriving it of its lawyers." *In re Mervyn's*, slip op. at 14. As the law makes clear, such a motive, particularly on a motion concerning the fundamental relationship between a client and "the lawyer of its choice," has no basis in litigation. *Id.; see also Deptula*, 2003 WL 23274846, at *1 ("motions to disqualify [should not be] used as just another weapon in the litigation arsenal.").

## V.    DISQUALIFYING KIRKLAND WOULD UNFAIRLY PREJUDICE SUN CAPITAL.

The belated nature and substantive weakness of plaintiff's disqualification argument is even more disturbing when viewed in tandem with the obvious prejudice that will be suffered by Sun Capital if Kirkland is actually disqualified. Disqualification of Kirkland will force Sun Capital to start again at square one with new counsel, who will be well over a year behind plaintiff in terms of understanding the transactions implicated by this litigation. Such a head-start would give an enormous tactical advantage to plaintiff (particularly at this juncture, as discovery is now underway) and, perversely, would *reward* his tardy filing of his motion. Disqualification would also impose an unacceptable financial burden on Sun Capital. Indeed, if successor counsel must be retained, Sun Capital will have to pay substantial sums to new lawyers to learn facts long since mastered by Kirkland. This would be very expensive and wasteful.

In the face of such harm to Sun Capital, the Court need not order Kirkland's disqualification, *even* if it finds a violation of the ethical rules. *See, e.g., Elonex I.P. Holdings, Ltd.*, 142 F. Supp. 2d at 583 ("disqualification is never automatic"); *Express Scripts, Inc. v. Crawford*, No. 2663-N, 2007 WL 417193, at *1 (Del. Ch. Jan. 25, 2007) ("[D]isqualification

does not always serve as an appropriate remedy for violations of Rule 1.9."). As the Third

Circuit has held, in considering a motion to disqualify, this court should apply a balance test and:

> should disqualify an attorney *only* when it determines, on the facts
> of a particular case, that disqualification is an appropriate means of
> enforcing the applicable disciplinary rule. It should consider the
> ends that the disciplinary rule is designed to serve and any
> countervailing policies, such as permitting a litigant to retain the
> counsel of his choice and enabling attorneys to practice without
> excessive restrictions."

*United States v. Miller*, 624 F. 2d 1198, 1201 (3d Cir. 1980) (emphasis supplied). In the instant

case, any balancing test weighs heavily in favor of Sun Capital. *First*, disqualification would

repudiate the valid written waiver agreement executed by Indalex, upon which Sun Capital relied

in retaining Kirkland in the Indalex bankruptcy. *Second*, disqualification would not serve the

purpose of Model Rule 1.9, which is designed to protect client confidences by prohibiting

lawyers from switching sides in the same or a substantially related matter. There are no client

confidentiality concerns at issue here, and Kirkland did not "switch sides" on any matter relevant

to this proceeding. *Third*, disqualification of Kirkland, particularly at this late juncture, would

impose significant litigation disadvantages and costs on the Sun Capital Defendants.

Conversely, plaintiff does not and cannot identify *any* harm that the debtors will suffer if

Kirkland is not disqualified.

## CONCLUSION

For all of the foregoing reasons, the Sun Capital Defendants respectfully request that the

Court deny plaintiff's Motion to Disqualify Kirkland & Ellis LLP.

RLF1 3693689v. 1

Dated:  December 10, 2010
        Wilmington, Delaware

Respectfully submitted,

Daniel J. DeFranceschi (No. 2732)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*and*

John F. Hartmann, P.C.
Michael A. Duffy
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for the Sun Capital Defendants*

32