# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| IH 1, Inc., et al., | Case No.: 09-10982 (PJW) |
| Debtors, | (Jointly Administered) |
| GEORGE L. MILLER, Chapter 7 Trustee, | |
| Plaintiff, | |
| v. | Adv. Proc. No.: 10-52279 (PJW) |
| SUN CAPITAL PARTNERS, INC., et al. | |
| Defendants. | |

## DECLARATION OF MICHAEL E. ALGER

I, Michael E. Alger, submit this declaration in support of the Sun Defendants' Opposition to Plaintiff's Motion to Disqualify Kirkland & Ellis LLP. I have personal knowledge of the facts stated in this declaration, which are true and correct, and could competently testify as to each if called to do so.

1. I am a Certified Public Accountant and I am currently a Group CFO for Sun Capital Partners, Inc. I have over 28 years experience in senior finance and operations management.

2. Before joining Sun Capital Partners, Inc. in 2007, from 2000 to 2007, I was the Chief Financial Officer ("CFO") for Indalex Aluminum Solutions ("Indalex").

3. In my position as CFO for Indalex, I was involved in retaining outside law firms to represent Indalex on a number of occasions.

4. Prior to serving as CFO of Indalex, I was the Vice President of Finance for Favorite Brands, a large multi-brand confection company.

5. Additionally, in the 1990's, I was the CFO for Jel Sert and Olds Products, two food companies.

6. In May 2000, Caradon acquired the California aluminum extrusion businesses of Columbia Ventures Corporation, including Indalex, which provided Caradon with three extrusion facilities in California and one additional cast house.

7. Caradon was renamed Novar plc in November 2000.

8. In March 2005, Honeywell International Inc. acquired Novar plc and announced its intention to sell the aluminum extrusion business.

9. Later that year, as CFO for Indalex, I became aware that Sun Capital Partners, Inc. or one of its affiliates (collectively, "Sun Capital") was interested in acquiring Indalex. At that time, I did not have any prior association with Sun Capital.

10. As Indalex's CFO, I interacted with various law firms and lawyers throughout the multi-month due diligence process leading up to Sun Capital's acquisition of Indalex.

11. During the due diligence process, I learned that Sun Capital was a long-time client of Kirkland & Ellis LLP ("Kirkland"). Although I had not previously worked with Kirkland, having spent my entire career in the Chicago area, I was familiar with Kirkland and aware of Kirkland's excellent reputation.

12. I also learned that Kirkland represented Sun Capital and a number of Sun Capital portfolio companies on a variety of matters.

13. Throughout the due diligence process and leading up to Sun Capital's acquisition of Indalex, I regularly dealt with attorneys from Kirkland.

14. In addition, during the due diligence process, I regularly consulted with attorneys from other law firms involved in the acquisition.

15. Sun Capital acquired Indalex on February 2, 2006.

16. The closing for the acquisition took place in New York on February 2, 2006.

17. At the time of the acquisition, Indalex was a $425 million enterprise, with operations in several countries and over two thousand employees.

18. Before, during, and after Sun Capital acquired Indalex, Indalex utilized the services of a number of outside law firms, which represented Indalex in a variety of matters.

19. At the time of the acquisition, I, on behalf of Indalex, intended to retain Kirkland as one of Indalex's outside law firms.

20. In my mind, the decision to hire Kirkland was logical because, among other reasons, Kirkland attorneys had already gained substantial knowledge of Indalex through their work on Sun Capital's acquisition of Indalex and I was impressed with the individual Kirkland attorneys that I worked with throughout the acquisition process.

21. Prior to retaining Kirkland, I, on behalf of Indalex, received a copy of Kirkland's standard retention letter for Sun Capital portfolio companies.

22. Prior to signing the retention letter, I read the letter and understood its contents.

23. The retention letter confirmed my understanding, among other things, that Kirkland (a) had represented Sun Capital on a variety of matters; (b) represented Sun Capital in its investment in Indalex; (c) was, at the time, currently representing Sun Capital on a variety of matters; and (d) anticipated that it would represent Sun Capital in future matters.

24. At all times, I understood that I could and should consult independent counsel if I had questions about the language in the retention letter.

25. At all times, I understood that I could ask attorneys from Kirkland for clarification of any issues related to the retention letter.

26. After reading the letter, I did not have any questions and did not feel it was necessary to consult a lawyer with regard to the terms of the retention letter.

27. Upon reading the letter, I understood the meaning of the letter and understood the implications of agreeing to waive any potential conflict of interest between Indalex and Sun Capital.

28. When I signed the retention letter, I understood, among other things, that a potential conflict of interest could arise between Indalex and Sun Capital and that, if a conflict of interest arose in connection with Kirkland's representation of Indalex, Kirkland could continue to represent Sun Capital in any matter, including litigation matters where Sun Capital may be adverse to Indalex.

29. By signing the retention letter, I intentionally and knowingly consented to, and waived any conflict or other objection with respect to Kirkland's representation of Sun Capital in connection with any past, present, and future matters where Sun Capital was, or would become, adverse to Indalex, including litigation matters.

30. The decision to retain Kirkland to represent Indalex in certain matters following the acquisition was made by me, in my capacity as CFO, with the approval of Tim Stubbs, Indalex's Chief Executive Officer.

31. It was not necessary for Indalex's board of directors to approve the hiring of Kirkland, and it was not customary for Indalex's board of directors to approve the hiring of outside counsel.

32. Indalex was not under any obligation to retain Kirkland and, at all times, I felt

free to negotiate the terms of the retention letter with Kirkland.

33. By signing the retention letter, I was not committing to use Kirkland for any specific matter and could have (and did) hire other counsel for various matters even after signing the retention letter.

34. In addition to Kirkland, following the acquisition by Sun Capital, Indalex utilized the services of other law firms when it was in the best interest of Indalex to do so. For example, Indalex retained Freshfields to represent it in connection with the sale of Indalex's interest in AAG because we believed Freshfields was better suited than Kirkland to represent Indalex for that matter.

35. At the time that I signed the waiver letter, I understood the risks involved and intentionally waived any conflict of interest.

I declare subject to penalty of perjury that the foregoing is true and correct.

Executed on December 9, 2010.

_____
Michael E. Alger